**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **JOHN WILLIAMS, on behalf of himself and all others similarly situated,** | |
| **Plaintiff,** | **Case No. 1:11-cv-00647-SAS-SKB** |
| **v.** | **Judge:  S. Arthur Spiegel** |
| **TIME WARNER CABLE INC., and ABC COMPANIES, 1-100,** | **Magistrate Judge: Stephanie K. Bowman** |
| **Defendants.** | |

**DEFENDANT TIME WARNER CABLE INC.'S MEMORANDUM IN SUPPORT
OF MOTION TO COMPEL ARBITRATION AND DISMISS AMENDED COMPLAINT
OR, IN THE ALTERNATIVE, STAY THIS ACTION PENDING ARBITRATION**

## I.     INTRODUCTION

Plaintiff's original action was premised on a misconception of the facts, as was pointed out in Defendant Time Warner Cable's ("TWC's") original motion to dismiss and compel arbitration.  Apparently conceding that fact, Plaintiff chose to file an Amended Complaint rather than to respond to TWC's motion.  However, Plaintiff's attempt to "fix" his misstatement of the facts in his Amended Complaint is equally unavailing.

Plaintiff originally claimed that TWC engaged in unfair, deceptive, and unconscionable acts by raising the rate of his Price Lock Guarantee ("PLG") package during his *second* 24 month period in alleged breach of the terms of his contract.  As TWC noted in its motion to dismiss and compel arbitration, however, the contract at issue specifically provided that Plaintiff's rate *would* increase a specified amount in month 13 of *each* 24 month period.  TWC further noted that Plaintiff could not claim that he was deceived as to this fact because he

received a renewal notice that specifically informed him that "*[t]he price for the first year will be $87.35 and the price for the second year will be $94.85*."  (*See* Dkt. No. 7 at 2-3.)

Faced with this evidence, Plaintiff has now abandoned his allegations about the price increase in month 13 of his *second* 24 month period.  Instead, Plaintiff now alleges that TWC wrongly increased his monthly fee in 2009 during his *first* 24-month "Price Lock Guarantee" period, a price increase that Plaintiff never mentioned in his original Complaint.  This time shift in Plaintiff's allegations makes no difference to the merits of the claim.  Either way, Plaintiff's claim fails since the price of Plaintiff's package increased exactly as it was designed to do when Plaintiff entered into his PLG contract.

As the records indicate, Plaintiff signed up for a package that was designed to increase in the thirteenth month of each 24 month period.  Indeed, the Price Lock Guarantee's terms and conditions, which Plaintiff received in March 2008, expressly stated that "your discounted rate will increase at month 13 of your 24 month term."  (*See* Ex. 1, Declaration of Rob Fordham ("Fordham Dec."), at Ex. F.)  Thus, the entire premise of Plaintiff's Amended Complaint—that the price would not increase during the Plaintiff's *first* 24 month period—remains in error.

In any event, setting aside any consideration of the merits of Plaintiff's original Complaint or his Amended Complaint, the Court should order the Plaintiff to proceed to arbitration and dismiss this action because his claims are subject to an express mandatory arbitration clause that requires the Plaintiff to arbitrate his claims.[1]  Plaintiff's subscription agreement with TWC requires him to arbitrate any disputes with TWC arising out of Plaintiff's relationship with TWC.  TWC's counsel advised Plaintiff's counsel of the arbitrability of

---

[1] In its Motion, TWC cites to 9 U.S.C. §§ 2, 3, and 4 and Civil Rules 12(b)(1), (3), and (6) because federal courts have cited such authority to enforce arbitration agreements and dismiss or stay certain claims subject to arbitration.  In addition, TWC provides additional facts for background purposes.  At this stage of the proceedings, however, TWC is only moving to enforce the arbitration agreement, separate and apart from any consideration of the merits of Plaintiff's claims.  TWC respectfully submits that any consideration of the merits should be decided exclusively in arbitration.

Plaintiff's claims in November.  But instead of seeking redress through arbitration or articulating any response as to why his claims are not subject to arbitration, Plaintiff attempted to "opt out" of his arbitration agreement via a letter dated December 14, 2011—one day before filing his Amended Complaint and more than nineteen months after his 30-day opt-out window had expired.  Plaintiff's Amended Complaint, in turn, attached that letter and left the issue of arbitrability otherwise unaddressed.  Nothing in Plaintiff's Amended Complaint changes the fact that Plaintiff's claims are subject to arbitration.

Indeed, the parties agreed to arbitration in part to prevent expensive and drawn-out litigation between them, but the Plaintiff has resorted to a strategy of amending his complaint in order to extend the life of this lawsuit, forcing TWC to incur the additional expense of filing yet another motion to compel arbitration and dismiss Plaintiff's claims.  Meanwhile, Plaintiff has yet to articulate any valid reason why arbitration is inappropriate here.  Accordingly, to help minimize any unnecessary litigation expense, this Court should compel arbitration and dismiss Plaintiff's claims.  In the alternative, the Court should stay this case pending arbitration.

## II.     BACKGROUND

### A.     The Entire Premise Of Plaintiff's Lawsuit Is Simply In Error.

Plaintiff's entire lawsuit rests on a faulty premise and should not have been filed, let alone continued through an amended complaint after TWC already explained the fundamental flaws of Plaintiff's case.  Plaintiff's original complaint alleged that he enrolled in a Price Lock Guarantee package in March 2008 for a 24-month period, and he allowed the Price Lock Guarantee to be automatically renewed for another 24-month period starting in March 2010.  In his original complaint, Plaintiff alleged that by increasing his monthly fee by $7.50 in March 2011—13 months into his *second* 24-month Price Lock Guarantee period—TWC breached its contract with Plaintiff and violated the Ohio Consumer Sales Practices Act.  (Orig. Compl.

¶¶ 11-19, 27-36, 49-56.)[2]  Plaintiff alleged that his monthly fee was not supposed to change during that 24-month period.  But, in fact, Plaintiff agreed that his monthly fee would increase at the thirteenth month of each 24-month period and that is exactly what happened.

When Plaintiff signed up for his Price Lock Guarantee package, the terms and conditions that he received with his confirmation letter stated: "As your Time Warner Cable representative discussed with you at the time of your order, *your discounted rate will increase at month 13 of your 24 month term.*"  (Ex. 1, Fordham Dec., at Ex. F, Terms and Conditions, Second Paragraph (emphasis added).)  Prior to the second 24-month period, Plaintiff received a renewal notice enclosing the same terms and conditions, which again stated:  "As your Time Warner Cable representative discussed with you at the time of your order, *your discounted rate will increase at month 13 of your 24 month term.*"  (*Id*. at Ex. G, Terms and Conditions, Second Paragraph (emphasis added).)  And the renewal letter provided to Plaintiff expressly stated:  "*The price for the first year will be $87.35 and the price for the second year will be $94.85.*"  (*Id*. at Ex. G, Renewal Letter, Second Paragraph (emphasis added).)  The renewal letter also indicated that, by allowing his Price Lock Guarantee package to renew, Plaintiff would enjoy savings of more than $429 over current standard rates during the second two years alone.  (*Id*.)  The Price Lock Guarantee offered such savings to Plaintiff by establishing certain discounted prices for each defined one-year period, which are exactly the prices that TWC charged to Plaintiff.  Thus, the entire premise of Plaintiff's original complaint was simply inaccurate and remains so.

## B. Plaintiff's Amended Complaint Does Nothing To Address The Fundamental Error At The Heart Of His Claims.

TWC explained all of this in its November 16, 2011 letter to Plaintiff's counsel and again in its Motion to Dismiss And Compel Arbitration (the "Motion").  Moreover, TWC pointed out

---

[2] Based on these facts, Plaintiff also alleged that TWC was liable under theories of promissory estoppel and unjust enrichment.  (Orig. Compl. ¶¶ 37-48.)

that while Plaintiff's original complaint objected to his price increasing during month 13 of his *second* 24-month Price Lock Guarantee package, Plaintiff <u>never</u> objected to his monthly fee increase during his *first* 24-month package.  (*See* Motion at 3.)

Rather than dismiss his claims or respond to TWC's letter or Motion, Plaintiff amended his complaint.  Plaintiff now alleges that the *original* month-13 price increase in March 2009 was somehow wrongful.  Plaintiff's new complaint omits any mention of the *second* month-13 price increase in March 2011.  (Amend. Compl. ¶ 22.)  Plaintiff also adds a new fraud claim based on alleged misrepresentations and omissions concerning his first month-13 price increase.  (Amend. Compl. ¶¶ 57-64.)  Plaintiff's amendment does nothing to address the erroneous premise that underlies this action.  As set forth above, even before Plaintiff received his February 2010 renewal letter alerting him to the second month-13 price increase, Plaintiff had already received, at the start of his *first* 24-month package, terms and conditions that stated: "As your Time Warner Cable representative discussed with you at the time of your order, *your discounted rate will increase at month 13 of your 24 month term.*"  (Ex. 1, Fordham Dec., at Ex. F, Terms and Conditions, Second Paragraph (emphasis added).)  Presumably recognizing this point, Plaintiff then attaches to his Amended Complaint different Price Lock Guarantee terms that he apparently printed after the fact.  (Amend. Compl. ¶ 18-19 & Ex. B.)  Plaintiff himself received the terms and conditions that applied to *his* package, which called for a month-13 price increase.[3]  The terms and conditions that Plaintiff attached to his Amended Complaint are no longer even offered to Time Warner Customers in Ohio.  (Ex. 1, Fordham Dec., at ¶ 7.)

Moreover, Plaintiff also alleges that the March 2008 letter was sent "after he had agreed to enroll in the Program" (Amend. Compl. ¶ 26), presumably to assert that the express notice of

---

[3] Moreover, contrary to Plaintiff's allegations (Amend. Compl. ¶¶ 26-27), TWC can establish that Plaintiff received the confirmation letter and terms as they appear in Exhibit F to Robert Fordham's declaration.  (*See* Ex. 1, Fordham Dec., at ¶ 5.)

his month-13 price increase came too late.  If this matter proceeds to arbitration, the parties will no doubt present evidence regarding those discussions, but Plaintiff's claim fails regardless.  The same terms and conditions that expressly alerted Plaintiff to the month-13 price increase also expressly provided him a "trial period," allowing him to cancel his package or any part thereof "without incurring an early termination fee" anytime "within 60 days of the date Time Warner Cable begins to deliver your discounted services to you."  (Ex. 1, Fordham Dec., at Ex. F, Terms and Conditions, Fifth Paragraph.)  Plaintiff does not allege, nor could he, that he received his terms and conditions after this 60-day penalty-free trial period expired.  Accordingly, Plaintiff's allegations regarding the timing of the notice that he received ring hollow.

Finally, now that Plaintiff bases his lawsuit on a March 2009 price increase instead of a March 2011 price increase, his claims are further barred by his Subscription Agreement, in which he expressly agreed to waive any proceeding against TWC if the relevant events occurred more than one year earlier:

> You waive (in other words, give up) the right to commence any proceeding against TWC if the relevant events occurred more than one year earlier. This waiver is not enforceable, and the normal statute of limitations in your area will apply, if you notified TWC in writing of the events giving rise to the proceeding within one year of their occurrence.

(*Id*. at Ex. D ¶ 14.)  Based on TWC's inquiries, Plaintiff never objected to his March 2009 price increase until he filed his Amended Complaint on December 15, 2011.[4]

### C.     In Any Event, Plaintiff Agreed To Arbitrate His Claims.

When Plaintiff first opened his account with TWC in 2003, Plaintiff signed a work order for the account.  (*See id*. at ¶ 2 & Ex. A.)  Plaintiff agreed that "[m]y signature on this order indicates that (I) (customer) have received and agreed to the terms of the Cable Modem Service

---

[4] Indeed, with regard to billing disputes, the Subscription Agreement further provides: "You must bring any billing errors to our attention within 30 days of the day you receive the bill or you will waive your right to (in other words, you will not be eligible to receive) a refund or credit."  (*Id*. at Ex. D ¶ 1(i).)  Plaintiff's belated claim is even more untimely given this specific provision.

Subscription Agreement separately provided to me by Time Warner Cable of Cincinnati. . . . "
(*See id*. at Ex. A, hereinafter with amendments, "Subscription Agreement.")  Directly above his
signature, the work order drew his attention to "Section 13 of that Agreement, which provides
that the parties desire to resolve disputes relating to that Agreement through arbitration."  (*Id*.)
The work order also states that "[s]ubscriber also acknowledges that by agreeing to arbitration,
subscriber is giving up various rights, including the right to a trial by jury."  (*Id*.)  Moreover, the
work order stated that "the terms of the Cable Modem Service Subscription Agreement,
including Section 13, are incorporated into this work order by reference as if set out in full."
(*Id*.)

      Consistent with the work order, the Subscription Agreement provided that "[a]ny
controversy or claim arising out of or related to this agreement . . . shall be resolved by binding
arbitration . . . under the then-current commercial arbitration rules of the American Arbitration
Association."  (*See id*. at Ex. B ¶ 13.)  It also provided that "either party may seek equitable or
injunctive relief only in an appropriate court of law or equity," but that "[n]o claim subject to
arbitration under this agreement may be combined with a claim subject to resolution before a
court of law or equity."  (*Id*.)  It also provided that "[t]he arbitrability of disputes shall be
determined by the arbitrator," and "[c]onsolidated or class action arbitrations shall not be
permitted."  (*Id*.)[5]

---

[5] The quoted language from the work order and Subscription Agreement was set forth in all capital letters.
On January 26, 2004, Rene Filiatraut signed another work order for additional work at Plaintiff's home, agreeing
that she had authority to do so.  That work order again incorporated the Subscription Agreement and called attention
to the arbitration clause, just as the 2003 work order did.  (*See id*. at ¶ 3 & Ex. C.)

Over time, the arbitration clause has been amended by superseding versions of the Subscription Agreement.[6]  (*See id.* at ¶ 4.)  The current version, effective on the date that Plaintiff filed his Complaint, provides, in pertinent part:

> 15. Unless you Opt Out, You are Agreeing to Resolve Certain Disputes Through Arbitration
>
> (a) Our goal is to resolve Disputes fairly and quickly. However, if we cannot resolve a Dispute with you, then, except as described elsewhere in Section 15, each of us agrees to submit the Dispute to the American Arbitration Association for resolution under its Commercial Arbitration Rules or, by separate mutual agreement, to another arbitration institution. As an alternative, you may bring your claim in your local "small claims" court, if its rules permit it.
>
> (b) You may bring claims only on your own behalf, and not on behalf of any official or other person, or any class of people. Only claims for money damages may be submitted to arbitration; claims for injunctive orders or similar relief must be brought in a court. You may not combine a claim that is subject to arbitration under this Agreement with a claim that is not eligible for arbitration under this Agreement. The arbitrator will decide whether a dispute can be arbitrated.

(*Id.* at ¶ 4 & Ex. D ¶ 15.)

"Dispute" is defined as "any dispute, claim, or controversy between you and TWC regarding any aspect of your relationship with us, including those based on events that occurred prior to the date of this Agreement."  (*Id.* at Ex. D ¶ 16.)  The first page of the Subscription Agreement alerts customers, in all capital letters, that the agreement "contains a binding 'arbitration clause,' which says that you and TWC agree to resolve certain disputes through arbitration.  You have the right to opt out of this part of the agreement.  See Section 15."  (*Id.* at Ex. D.)

The arbitration clause's opt-out provision provides:

---

[6] TWC notified Plaintiff of changes in the Subscription Agreement and, under the terms of his agreement, Plaintiff accepted those changes by continuing to use TWC services.  (*See id.* at Ex. B ¶ 2(e).)  As the argument below makes clear, however, none of the changes to the arbitration clause makes any difference as to the arbitrability of Plaintiff's claims.  Rather, his claims would be subject to arbitration under any version of the arbitration clause.

> (e) You may opt out of this agreement's arbitration provision. If you do so, neither you nor TWC can require the other to participate in an arbitration proceeding. To opt out, you must notify TWC in writing within 30 days of the date that you first became subject to this arbitration provision. You must use one of these addresses to opt out:
>
> Time Warner Cable
> 60 Columbus Circle, Rm 16-364
> New York, NY 10023
> Attn: Arbitration Opt-out
>
> or
>
> http://www.timewarnercable.com/arbitrationoptout
>
> You must include your name, address and TWC account number and a clear statement that you wish to opt out of this Agreement's arbitration obligation.

(*Id*. at ¶ 4 & Ex. D ¶ 15.)

The arbitration opt-out web page confirms the 30-day opt out window, stating in relevant part: "If you were an existing customer when the agreement came into effect, you have thirty days from the date you received notice of the company's adoption of the new agreement.  This notice would have been included in your billing statement." (*Id*. at Ex. I.)  Plaintiff's March 22, 2010 monthly billing statement expressly notified him of a new version of the Subscription Agreement, including the parties' arbitration clause and the opt out right:

> You have a new Time Warner Cable subscriber agreement, which contains an arbitration clause and other important terms.  You can review the new agreement and, if you wish, 'opt out' of the arbitration clause at http://help.twcable.com/html/policies.html.

(*Id*. at Ex. J.)  This notice appeared under a heading that read "LOOK HERE."  Accordingly, even presuming this billing statement arrived seven days after its March 22, 2010 statement date and treating March 29, 2010, as the date that Plaintiff received notice of the new agreement, Plaintiff's 30-day window to opt out of arbitration expired no later than April 28, 2010.  Prior to

TWC's November 21, 2011 motion to dismiss and compel arbitration, Plaintiff had never opted out, or attempted to opt out, of his arbitration agreement.

Notwithstanding the parties' express arbitration provision barring Plaintiff's civil claims, Plaintiff filed this lawsuit.  Because Plaintiff's claims clearly arise out of a dispute with TWC that is subject to a mandatory arbitration clause, TWC requested on November 16, 2011 that Plaintiff dismiss this case and proceed in the appropriate forum.  Receiving no response, TWC filed its Motion on November 21, 2011, seeking dismissal and an order compelling arbitration, or, at a minimum, a stay pending arbitration.  Rather than respond to that Motion, Plaintiff filed his Amended Complaint on December 15, 2011.

The entirety of the Amended Complaint's treatment of the arbitrability of this dispute is found in footnote 2 of the complaint:

> On November 21, 2011, TWC filed a motion to dismiss seeking to subject the claims asserted in Plaintiff's original Complaint to arbitration pursuant to paragraph 15 of the Time Warner Cable Residential Services Subscriber Agreement.  Although Plaintiff vigorously disputes the validity, enforceability, and applicability of paragraph 15 to Plaintiff's claims, out of abundance of caution, and without waiving any right to challenge any provision of the Time Warner Cable Residential Services Subscriber Agreement, Plaintiff provided written notice to TWC of his decision to opt out of paragraph 15 pursuant to the procedure set forth at paragraph 15(e).  A copy of Plaintiff's opt out letter is attached hereto as Exhibit A.

(Amend. Compl. at page 3, n.2 & Ex. A.)  The footnote makes no mention of the 30-day opt-out window in paragraph 15(e) of the Subscription Agreement.  (*See* Ex. 1, Fordham Dec. at Ex. D ¶ 15(e).)  The opt-out letter attached as Exhibit A to Plaintiff's Amended Complaint is dated December 14, 2011, *one day before Plaintiff filed his Amended Complaint, and over nineteen months after his opt-out window expired*.  Plaintiff offers no explanation for why his December 14, 2011 opt-out letter should be considered timely.  Nor does Plaintiff offer any

explanation as to why he "vigorously disputes the validity, enforceability, and applicability" of the arbitration provision.

Accordingly, the Court should compel arbitration and dismiss this action.  Under the parties' agreement, the arbitrator should decide the merits of Plaintiff's claims.  At a minimum, in the alternative, the Court should stay these proceedings pending arbitration.

## III.   ARGUMENT

### A.   The Court Should Compel Arbitration And Dismiss Plaintiff's Complaint.

#### 1.   Federal Law Requires Enforcement Of Arbitration Agreements And Resolves Any Doubt In Favor Of Arbitrability.

Regardless of the merits of Plaintiff's claims, federal law compels arbitration in this case. The Federal Arbitration Act ("FAA") requires enforcement of valid arbitration agreements.  9 U.S.C. § 2.  There is a strong federal policy favoring arbitration, and "any doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  The United States Supreme Court has held that by honoring arbitration agreements and considering only those issues that go to the arbitration agreement's validity, a court "not only honor[s] the plain meaning of the [Federal Arbitration Act] but also the unmistakably clear congressional purpose that the arbitration procedure . . . be speedy and not subject to delay and obstruction in the courts."  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967).  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration . . . ."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).  Indeed, just this week, the United States Supreme Court again underscored the importance of enforcing arbitration clauses, finding that statutory language contemplating judicial enforcement and precluding waiver of rights created under a statute does

not demonstrate a right to initial court action that supersedes an arbitration clause. *See CompuCredit Corp. v. Greenwood*, __ U.S. __, 2012 U.S. Lexis 575 (Jan. 10, 2012).

While federal law compels arbitration in this case and controls here, the result would be the same under Ohio law as well. The Ohio Arbitration Act ("OAA") and Ohio public policy strongly favor arbitration as well. The OAA states:

> A provision in any written contract . . . to settle by arbitration a controversy that subsequently arises out of the contract, or out of the refusal to perform the whole or any part of the contract, or any agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, or arising after the agreement to submit, from a relationship then existing between them or that they simultaneously create, shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract.

Ohio Rev. Code § 2711.01(a). The Ohio Supreme Court has acknowledged that "[b]oth the Ohio General Assembly and Ohio courts have expressed a strong public policy favoring arbitration." *Hayes v. Oakridge Home*, 908 N.E.2d 408, 411 (Ohio 2009). "Arbitration is favored because it provides the parties thereto with a relatively expeditious and economical means of resolving a dispute." *Id.* (citation and punctuation omitted).[7]

Federal law allows a party to an arbitration agreement to seek an order compelling arbitration, 9 U.S.C. § 4, and/or a stay of litigation pending arbitration, 9 U.S.C. § 3. When all of the issues raised in the action are subject to arbitration, the Court should also "dismiss the lawsuit for lack of subject matter under Rule 12(b)(1) of the Federal Rules of Civil Procedure." *Aracri v. Dillard's, Inc.*, 2011 U.S. Dist. LEXIS 41596 (S.D. Ohio Mar. 29, 2011) (quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000); *see also United Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Indus. v. Ross Brothers Cons. Co.*, 191

---

[7] As Ohio courts have found, "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Academy of Medicine of Cincinnati v. Aetna Health, Inc.*, 842 N.E.2d 488, 492 (Ohio 2006) (citations and punctuation omitted). "In light of the strong presumption favoring arbitration, all doubts should be resolved in its favor." *Hayes*, 908 N.E.2d at 412.

F.3d 714, 719 (6th Cir. 1999) (affirming district court's dismissal of counterclaim based on existence of arbitration agreement); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("[T]he weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration." (citations and emphasis omitted)); *C.H.I. Inc. v. Marcus Bros. Textile, Inc.*, 930 F.2d 762, 764 (9th Cir. 1991) (affirming granting of motion to dismiss where parties agreed to arbitrate disputes); *Lewis Tree Service v. Lucent Tech., Inc.*, 239 F. Supp. 2d 332, 340 (S.D.N.Y. 2002) ("Because all of Ironman's claims are subject to arbitration, no useful purpose will be served by granting a stay of Ironman's claims and thus its action against the defendants is dismissed.").

Applying these settled principles, courts routinely compel arbitration in cases alleging breach of contract, violations of the Ohio Consumer Sales Practices Act, fraud, and related claims in which the parties agreed to arbitrate their disputes.  *See, e.g.*, *Stout v. J.D. Byrider*, 228 F.3d 709, 716 (6th Cir. 2000); *Stachurski v. DirecTV, Inc.*, 642 F. Supp. 2d 758, 774 (N.D. Ohio 2009); *Phelps v. U.S. Metals Group*, 2010 U.S. Dist. LEXIS 19392, at *16 (N.D. Ohio Mar. 4, 2010); *see also Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St. 3d 352, 368 (Ohio 2008); *Wallace v. Ganley Auto Group*, 2011-Ohio-2909, at ¶ 34 (Ohio Ct. App. June 16, 2011).  The same result applies here and compels arbitration of Plaintiff's claims.

## 2.    The Parties' Arbitration Agreement Requires Arbitration In This Case.

Plaintiff's arbitration agreement mandates that Plaintiff's claims be dismissed and that Plaintiff proceed individually in arbitration.  The Price Lock Guarantee terms and conditions that are at the heart of this matter make clear that they are "a binding addition" to Plaintiff's Subscription Agreement.  (Ex. 1, Fordham Dec., at Ex. F & G.)  The Subscription Agreement provides that a customer agrees to arbitrate "any dispute, claim, or controversy between you and

TWC regarding any aspect of your relationship with us, including those based on events that occurred prior to the date of this Agreement." (*Id*. at Ex. D ¶¶ 15, 16.) The arbitration provision adds that a customer "*may bring claims only on your own behalf, and not on behalf of any official or other person, or any class of people*." (*Id*. at Ex. D ¶ 15 (emphasis added).)

Plaintiff's new claims are based solely on an increase in monthly fees during his first 24-month Price Lock Guarantee period, which Plaintiff alleges is contrary to his contract with TWC. Plaintiff makes no other specific underlying factual allegations to support any wrongdoing other than the allegedly unauthorized and undisclosed price increase in March 2009, halfway through his first 24-month Price Lock Guarantee period. Accordingly, there can be no question that Plaintiff's claims fall within the scope of arbitrable disputes, i.e., "any dispute, claim, or controversy between you and TWC regarding any aspect of your relationship with us."

Moreover, the Supreme Court has clearly erased any doubt as to the enforceability of an arbitration provision barring class action arbitrations over state law claims like the ones present here. *See AT&T Mobility LLC v. Concepcion*, __ U.S. __, 131 S. Ct. 1740, 1752 (2011). In so ruling, the Court noted that "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id*. at 1748. The same result applies here. *See also Wallace*, 2011-Ohio-2909, at ¶¶ 15-19 (following *Concepcion* and enforcing arbitration clause barring class action arbitrations in case alleging Ohio Consumer Sales Practices Act and fraud claims).

The Complaint's reference to injunctive and other non-monetary relief does not change the result. At the outset, the arbitration clause that governs this dispute makes clear that Plaintiff "may not combine a claim that is subject to arbitration under this Agreement with a claim that is not eligible for arbitration under this Agreement." (Ex. 1, Fordham Dec., at Ex. D ¶ 15.) The

Complaint here attempts to do exactly that.  Plaintiff's prayer for relief clearly seeks, on behalf of a putative class, actual and statutory damages, costs of suit, pre- and post-judgment interest, and attorneys' fees.  (Compl. at ¶ 57.)  Plaintiff's request for injunctive and other non-monetary relief is thus directly contrary to the arbitration provisions, and must be dismissed.

Moreover, the injunction exception in the arbitration agreement has no application here under any scenario.  Although the arbitration agreement allows claims for injunctive relief under certain conditions, that provision has no import here because, among other things, Plaintiff fails to allege any ongoing irreparable injury and no injunctive relief is required to keep Plaintiff's claim from being rendered a nullity.  In *Kwasny Co. v. Acrylicon Int'l Ltd.*, 2010 U.S. Dist. LEXIS 58149 (E.D. Mich. June 11, 2010), for instance, another federal court in the Sixth Circuit rejected the argument that an arbitration clause allowing the parties to "pursue injunctive relief where appropriate in any court of competent jurisdiction" permitted a party to pursue injunctive relief in Court before arbitrable claims were decided.  *Id*. at *22.  Rather, the court construed its authority to grant injunctive relief in that instance "as limited to such relief as is necessary to avoid rendering the process of arbitration meaningless or a hollow formality."  *Id*. (citation and punctuation omitted).  Since injunctive relief was not "necessary to preserve the viability of the parties' chosen method of dispute resolution," the court declined to allow any injunctive-relief claim to proceed while the arbitrable claims were pending.  *Id*. at *22, *25.

That result is particularly apt here.  Indeed, presumably because Plaintiff now focuses on his *first* Price Lock Guarantee period (which ended in 2010) instead of his *second* renewed period, <u>Plaintiff no longer alleges, as he did in his original complaint, that he "continues to suffer" harm as a result of improper payments in his second 24-month period.</u>  (*Compare* Orig. Compl. ¶¶ 36, 46, *with* Amend. Compl. ¶¶ 44, 54.)  Plaintiff <u>deleted</u> those allegations from his

Amended Complaint.  Thus, even that tenuous link to injunctive relief—which was insufficient at the outset—is now gone.  Plaintiff alleges no ongoing irreparable injury to himself.  Thus, he cannot purport to argue an injunction exception to his claims.  Nor is his Price Lock Guarantee package even offered any more.  (Ex. 1, Fordham Dec., at Ex. ¶ 7.)

Furthermore, even if the clear language of the Subscription Agreement were set aside, the claims subject to arbitration should proceed to arbitration and the injunctive relief claims should be dismissed without prejudice since the underlying factual allegations are inextricably intertwined with the arbitrable claims.  Where there are factual disputes underlying arbitral claims and non-arbitral claims, the factual disputes underlying such claims should proceed to arbitration and be resolved by the arbitrator in the first instance.  *See Blanchard Valley Health Ass'n v. ProMedica Health Sys.*, 2006-Ohio-5966, ¶ 26, 2006 Ohio App. LEXIS 5904, at *18 (Ohio Ct. App. 2006) (holding that when "overall transaction" involved an agreement with an arbitration clause, an alleged violation of another agreement without an arbitration clause was "inextricably intertwined" and must be arbitrated).  Indeed, courts have gone even further than required here, deferring to arbitration before deciding disputes intertwined with other claims involving parties that were not even signatories to the operative arbitration clause at all. *See, e.g.*, *Gordon v. Royal Palm Real Estate Inv. Fund I, LLP*, 2011 U.S. Dist. LEXIS 22911, at *26 (E.D. Mich. Mar. 8, 2011) (staying litigation of claims against parties outside of arbitration agreement when claims were intertwined with arbitrable claims); *Vaughn v. Marshall*, 2009 U.S. Dist. LEXIS 98171, at *6-*7, *15 (S.D. Ohio Oct. 8, 2009) (same).

Plaintiff's eleventh-hour attempt to opt out of his arbitration agreement does not change the result.  As set forth earlier, Plaintiff had 30 days to opt out of the arbitration provision from the time he received notice of the new version of the Subscription Agreement that allowed him to

opt out of arbitration. Plaintiff did not opt out of arbitration during his 30-day opt out window, which expired in April of 2010, but rather waited until a day before filing his Amended Complaint—and nearly three months after commencing this lawsuit—to send his letter attempting to opt out of arbitration. Plaintiff was over nineteen months late.

Multiple federal courts, including the Sixth Circuit, have already upheld opt out clauses and rejected similar efforts to circumvent arbitration in the face of such clauses. *See Legair v. Circuit City Stores, Inc.*, 213 Fed. App'x 436, 439 (6th Cir. 2007) (affirming order compelling arbitration when plaintiff failed to exercise his option to opt out of arbitration within 30 days); *Passmore v. Discover Bank*, 2011 U.S. Dist. LEXIS 123918, at *17-*18 (N.D. Ohio Oct. 26, 2011) (applying Delaware law and granting motion to compel arbitration when credit card agreement contained an arbitration clause with a 30-day opt-out period, use of the card constituted acceptance of the agreement, and Plaintiff declined to exercise her 30-day opt out right); *Losapio v. Comcast Corp.*, 2011 U.S. Dist. LEXIS 42257, at *10-11 (N.D. Ga. Apr. 18, 2011) (compelling arbitration of claims against a cable company, finding that plaintiff did not timely opt out of arbitration when the opt-out provision was limited to 30 days after receipt of a subscription agreement and plaintiff attempted to opt out after she had already filed her complaint and approximately 19 months after the 30-day window had expired).

Finally, Plaintiff's new fraud claim, based on alleged misrepresentations or omissions regarding the same month-13 price increase that drives the remainder of his claims, has no effect on the arbitrability of this dispute. Just as with his other claims, Plaintiff's fraud claim falls well within the scope of the arbitration clause (*see* Ex. 1, Fordham Dec., at Ex. D ¶ 16), and courts do not hesitate to enforce arbitration agreements in cases raising fraud claims along with Ohio

Consumer Sales Protection, breach of contract, or other related claims. *See, e.g.*, *Stout*, 228 F.3d at 716; *Phelps*, 2010 U.S. Dist. LEXIS 19392, at *16; *Wallace*, 2011-Ohio-2909, at ¶ 34.

Thus, as the arbitration provision makes clear, the Plaintiff cannot bring his damage claims in this Court as he has sought to do.  Moreover, no injunctive relief is necessary to preserve Plaintiff's rights to proceed to arbitration.  Indeed, Plaintiff alleges <u>no</u> ongoing injury to himself.  Even if Plaintiff were somehow permitted to bring injunctive relief claims, such claims should proceed to arbitration and should be decided by the arbitrator in the first instance since they are inextricably intertwined with his principal claim for damages.  Finally, neither Plaintiff's untimely attempt to opt out of arbitration nor his newly added fraud claim changes this result.  Accordingly, Plaintiff's Amended Complaint should be dismissed, and this matter should proceed in arbitration.

**B.      In The Alternative, The Court Should Stay The Case Pending Arbitration.**

Even if the Court were to find that the arbitrability of some of Plaintiff's claims were in genuine dispute, the Court should stay this case pending both (1) a determination by the arbitrator as to the arbitrability of Plaintiff's claims and (2) the outcome of arbitration on any claims that the arbitrator finds arbitrable.

If any genuine dispute as to the arbitrability of Plaintiff's claims exists, the Court should stay the case while an arbitrator resolves that dispute.  Where the parties "have clearly and unmistakably vested the arbitrator with the authority to decide the issue of arbitrability, the question of whether a matter is arbitrable is to be decided by the arbitrator."  *Belmont Cty. Sheriff v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 820 N.E.2d 918, 921 (Ohio 2004); *see also Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 769 (E.D. Mich. 2010).  "Consistent with the express language of [such an] arbitration clause, it is for the arbitrator, and not the courts, to decide whether the parties have an agreement for arbitration that encompasses the dispute

between them." *Cheney v. Sears, Roebuck and Co.*, 2005-Ohio-3283, ¶ 13, 2005 Ohio App. LEXIS 3052, at *10-*11 (Ohio Ct. App. 2005) (affirming stay of case when arbitrator found some claims arbitrable); *see also Union Twp., Clermont Cty. v. Union Twp. Professional Firefighters' Local 3412*, 756 N.E.2d 204, 209 (Ohio Ct. App. 2001) (A "court does not determine the issue of arbitrability where the contract itself reserves the question of arbitrability for the arbitrator.").  Here, the Subscription Agreement unambiguously provides that "[t]he arbitrator will decide whether a dispute can be arbitrated."  (Ex. 1, Fordham Dec., at Ex. D ¶ 15.) Accordingly, the Court should, at the very least, stay this case while the arbitrator decides any possible dispute about the arbitrability of Plaintiff's claims.

Moreover, even if there were a non-arbitrable claim, it would be appropriate to stay this action while the arbitrator decides the merits of Plaintiff's claims and his entitlement to the monetary damages he seeks.  Even against third-party defendants who are not parties to an arbitration agreement, courts routinely stay non-arbitrable "tail-wagging-the-dog" type claims that are "inextricably intertwined" with claims subject to arbitration.  *Patnik v. Citicorp Bank Trust FSB*, 412 F. Supp. 2d 753, 763 (N.D. Ohio 2005).  Here, Plaintiff's purported request for injunctive relief is based on the same single theory of wrongdoing as his claims for damages. Any claim for injunctive relief would necessarily require this Court to overlap with an arbitrator on questions of liability as well as questions of the availability and adequacy of monetary damages as relief.  *See Gordon*, 2011 U.S. Dist LEXIS, at *24 ("[A] court should stay litigation of non-arbitrable claims where a decision in one forum could affect the resolution of claims in the other." (citation and punctuation omitted)); *id*. at *27 (staying intertwined non-arbitrable claims against parties outside of arbitration agreement because "allowing the case to go forward

could subvert the arbitration agreement" between the other parties, and "arbitration could, arguably, resolve some of the contested issues in this case" (citations and punctuation omitted)).

Accordingly, even if the Court were not inclined to dismiss Plaintiff's Amended Complaint in its entirety pursuant to the arbitration clause in the Subscription Agreement, it should at the very least stay this action until an arbitrator determines the merits (if any) of Plaintiff's claims and his entitlement to damages. *See, e.g.*, *Gordon*, 2011 U.S. Dist. LEXIS 22911, at *30; *Vaughn*, 2009 U.S. Dist. LEXIS 98171, at *15; *see also, e.g.*, *Kwasny Co*, 2010 U.S. Dist. LEXIS 58149, at *25 (in case involving arbitration clause that permitted injunctive relief claims in court, staying injunctive-relief and other non-arbitrable claims pending outcome of arbitration).

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court should compel arbitration and, as a result, dismiss Plaintiff's Amended Complaint or, in the alternative, stay this case pending arbitration.[8]

Dated: January 13, 2012                                Respectfully submitted,


                                                        s/ Jeffrey J. Jones
                                                        _____
                                                        Jeffrey J. Jones  (0030059)
                                                          *Trial Attorney*
                                                          jjjones@jonesday.com
                                                        Erik J. Clark  (0078732)
                                                          ejclark@jonesday.com
                                                        JONES DAY
                                                        325 John H. McConnell Boulevard, Suite 600
                                                        Columbus, OH  43215-2673
                                                        Telephone:    +1.614.469.3939
                                                        Facsimile:    +1.614.461.4198

                                                        *Attorneys for Defendant*
                                                        *Time Warner Cable Inc.*

---

[8] For purposes of this motion, TWC assumes certain facts alleged by Plaintiff are true.  Accordingly, nothing in this motion should be construed as an admission of such facts.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2012, a true and correct copy of the foregoing was sent via email and electronically filed with the Clerk of the United States District Court of the Southern District of Ohio, using the CM/ECF system, which will send notification of such filing to counsel of record at the addresses that they have provided to the Court.

Jeffrey S. Goldenberg
Todd B. Naylor
Robert Sherwood
Goldenberg Schneider, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202-2012
jgoldenberg@gs-legal.com
tnaylor@gs-legal.com
rsherwood@gs-legal.com

Christian A. Jenkins
Minnillo & Jenkins, Co. L.P.A.
2712 Observatory Avenue
Cincinnati, OH 45202
cjenkins@minnillojenkins.com

*Attorneys for Plaintiff*

s/ Jeffrey J. Jones
One of the Attorneys for Defendant
Time Warner Cable Inc.