UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JOHN WILLIAMS, on behalf of himself and all others similarly situated, | Case No. 1:11-cv-00647-SAS-SKB |
| Plaintiff, | |
| v. | Judge: Sandra S. Beckwith |
| | Magistrate Judge: Stephanie K. Bowman |
| TIME WARNER CABLE INC., and ABC Companies, 1-100, | |
| Defendants. | |

**PLAINTIFF JOHN WILLIAMS' MEMORANDUM IN OPPOSITION TO DEFENDANT TIME WARNER CABLE INC.'S MOTION TO COMPEL ARBITRATION AND DISMISS AMENDED COMPLAINT OR, IN THE <u>ALTERNATIVE, STAY THIS ACTION PENDING ARBITRATION</u>**

Defendant Time Warner Cable Inc. ("TWC") moves to dismiss this action and compel arbitration based on the arbitration provision found at Paragraph 15 of the current TWC Subscriber Agreement ("Agreement") [Doc. 14-5].[1] However, Mr. Williams opted out of Paragraph 15 (including the arbitration provision) when he notified TWC in writing within 30 days of when he "first became subject to this arbitration provision" pursuant to the procedure set forth in Agreement. *Id.* at ¶15(e). More specifically, Mr. Williams opted out by sending written notice to TWC before filing suit when it became apparent that this dispute could not be resolved absent litigation,[2] and then again after TWC first sought to apply Paragraph 15 to Mr. Williams by filing a motion to dismiss.[3]

---

[1] For ease of reference, Mr. Williams will refer to the subscriber agreement upon which TWC's motion is based as the "Agreement." However, nothing in this memorandum should be construed to concede the enforceability or applicability of that Agreement to Mr. Williams.

[2] TWC's memorandum only acknowledges receiving Mr. Williams' December 14, 2011 opt out letter (Exh. A to Am. Compl.), which he sent within 30 days from when TWC first sought to apply the arbitration provision. However, Mr. Williams also previously sent TWC an opt out letter on September 14, 2011, prior to filing this action, when he first deemed his dispute with TWC to be irresolvable such that he "first became subject to" the arbitration clause at Paragraph 15. *See* Agreement [Doc 14-5] at ¶15(a) ("[I]f we cannot resolve a Dispute with you, then, … each of us agrees to submit the Dispute to the [arbitration]…"). A copy of the Mr. Williams' September 14, 2011 letter is attached hereto as Exhibit 1.

[3] By opting out of Paragraph 15 in its entirety, Mr. Williams also opted out of Paragraph 15's class action waiver. *See, e.g., Honig v. Comcast of Georgia*, 537 F. Supp. 2d 1277, 1289 n.7 (N D. Ga. 2008) ("Given that the class action waiver is a sub-provision within the arbitration provision, the ability to opt out of the arbitration provision necessarily allows one to opt out of the class action waiver.")

TWC nevertheless asserts (with little analysis)[4] that Mr. Williams' opt out letters were untimely. TWC claims that its records (introduced through a declaration containing disputed facts well beyond the pleadings) demonstrate that TWC sent Mr. Williams a monthly billing statement on or about March 22, 2010 that contained a small print disclosure of a new subscriber agreement posted on TWC's website. Def.'s Mem. [Doc. 14] at 9. Thus, "presuming the billing statement arrived seven days after its March 22, 2010 statement due and treating March 29, 2010 as the date that Plaintiff received notice of the new agreement," TWC postulates that "Plaintiff's 30-day window to opt out of arbitration expired no later than April 28, 2010." *Id*. TWC's argument, however, ignores the plain language of the opt out provision, which provides Mr. Williams 30 days from when he "first became subject to" the arbitration provision to opt out, not 30 days from when TWC first notified him that a new agreement was posted on its website.

There is only one construction of Paragraph 15's "first became subject to" language that is fully consistent with (1) the phrase's ordinary and plain meaning, (2) TWC's expressed intention of providing customers with meaningful opportunity to opt out, and (3) common law canons of contractual construction. Mr. Williams "first became subject to" Paragraph 15 when it first became invoked, implicated, and applicable to his circumstances (i.e. when an irresolvable dispute with TWC arose and/or when TWC first attempted to apply the arbitration provision to Mr. Williams). Because Mr. Williams opted out of the arbitration provision within 30 days from when he "first became subject to" Paragraph 15, TWC's motion should be denied.

---

[4] Curiously, although TWC "respectfully submits" in a footnote that consideration of the merits would be improper at this stage of the proceedings, it nevertheless spends forty percent of its memorandum discussing what it perceives to be Mr. William's "misconception of the facts" and other topics wholly irrelevant to the motion "for background purposes." Def.'s Mem.[Doc 14] at 2, n.1. Because Mr. Williams agrees that the merits are beyond the scope of the pending motion, he will not attempt to counter all of TWC's various mischaracterizations of the case other than to note that he disputes TWC's statement of facts.

I.      FACTUAL BACKGROUND

### A.  Mr. Williams' Enrollment in the Program and TWC's Subsequent Price Increase

Mr. Williams visited a TWC customer service center in or around March 2008 to exchange malfunctioning equipment. During the visit, a TWC representative solicited him to enroll in TWC's "Price Lock Guarantee" Program (the "Program") and represented that under the Program, if Plaintiff committed to subscribe to two or more of its services for a two-year period, TWC would charge Plaintiff a discounted monthly rate for the services and that discounted monthly rate would be "guaranteed" and "locked" for the term of the two-year commitment period. *See* Am. Compl. [Doc. 9] at ¶¶12-13. The TWC representative's standardized sales pitch echoed language from TWC's website, marketing, and other sales materials, all of which used terms and phrases like "Price Lock Guarantee," "lock in guaranteed savings," "guaranteed price," and "no surprises" to describe the Program. *Id*.

Mr. Williams accepted TWC's offer, agreed to enroll in the Program, and committed to purchase cable television and high-speed internet services from TWC for two years at the agreed upon "bundled" and "guaranteed" rate. *Id*. at ¶13. The TWC representative presented Mr. Williams with a written contract to formalize the agreement, which Mr. Williams signed. *Id*. at ¶15. Although TWC did not provide Mr. Williams a copy of this contract, upon information and belief, the contract was substantially similar to the standardized "Price Lock Guarantee Letter of Agreement" attached as Exhibit C to the Amended Complaint. *Id*. Nowhere in this document is TWC authorized to raise rates at the 13th month of the two year commitment period. To the contrary, the document specifically forbids TWC from doing so. *See* Exh. C to Am. Comp. ("*Except for the monthly fees – which you can always be sure of* – Time Warner Cable has the right to modify or delete any aspect, feature or requirement of the Price Lock Guarantee package or its individual components.") (emphasis added).

However, in March 2009, at the 13th month of his 24-month Price Lock Guarantee commitment period, Mr. Williams' monthly fee increased from $74.85 to $79.85. Mr. Williams received no

explanation from TWC for the rate increase. TWC now attempts to justify the rate increase by pointing to a sample[5] "confirmation letter," a similar version of which TWC claims *should have been generated and sent by a third party vendor to Mr. Williams after he had agreed to enroll in the Program.* *See* Def.'s Mem. [Doc. 14] at 4; [Doc. 14-7].[6] The letter states that as an enrollee in the Program, the recipient is entitled to a "discounted monthly *rate*[7] for twenty-four months" and the "peace of mind that comes with knowing … that you have locked-in guaranteed savings for two full years." *Id*. (emphasis added). According to TWC, enclosed with the confirmation letter was a brochure (supposedly generated and sent by the same third party vendor) containing the terms and conditions of the Price Lock Guarantee package. *See* Def.'s Mem. [Doc. 14] at 4. TWC relies on a single sentence in the small print brochure to justify the rate increase. It states, "As your Time Warner Cable representative discussed with you at the time of your order, your discounted rate will increase at month 13 of your 24 month term*.*" *Id*. (quoting [Doc. 14-7 at 1]). Curiously, that sentence directly contradicts another provision of the same brochure, which states, "You agree that Time Warner Cable has the right to add to, modify, or delete any aspect, feature, equipment or system requirement of this package or its individual components, *other than the price you are charged, during such periods.*" [Doc. 14-7 at 1.] (emphasis added).

More remarkable still is the fact that until very recently,[8] the version of the Program terms and conditions posted on TWC's website contained nearly identical language as the brochure's terms and

---

[5] The only evidence TWC offers to support its claim that Mr. Williams received such a confirmation letter is an unintelligible computer screenshot which TWC characterizes as "its record of sending Mr. Williams this confirmation letter." Fordham Decl. [Doc. 14-1] at ¶5. But even TWC admits that the screenshot only reflects that on that date, TWC "initiated the process of sending the letter and brochure through a third party vendor, which then [allegedly] generated and mailed the letter…." Fordham Decl. [Doc. 14-1] at ¶5; [Doc. 14-6].

[6] Mr. Williams does not recall ever receiving such a "confirmation letter" and TWC provides no proof that he did.

[7] Notably, the letter uses the term "rate," not "rates," indicating the existence of a single, fixed rate throughout the two-year commitment period.

[8] Shortly after Mr. Williams filed his Amended Complaint highlighting the inconsistent terms and conditions posted on TWC's website, TWC scrubbed all references to the Program (including the terms and conditions) from its website. However, a copy of the terms and conditions posted on TWC's website as recently as December 2011 is attached as Exhibit B to the Amended Complaint. By scrubbing its website, TWC recognizes how problematic its inconsistent representations are for the positions it takes in this case.

4

conditions, but with one critical difference – the website's terms and conditions contained no sentence authorizing the 13th month rate increase.  *See* Exh. B to Am. Compl. [Doc. 9].   In other words, the sole basis for TWC's position that it reserved the right to raise Mr. Williams' "locked" and "guaranteed" rate at the 13th month of his 24-month "Price Lock Guarantee" commitment period is a single sentence of a brochure that Plaintiff does not recall ever receiving (and for which TWC offers no proof of receipt).  *See* Am. Compl. [Doc. 9] at ¶¶17, 24-27.  This same sentence is also conspicuously absent from the terms and conditions that TWC posted on its website and contradicts other terms and conditions that are listed in the brochure and posted on TWC's website.  *See* Am. Compl. [Doc. 9] at ¶¶24-27.

TWC states that Mr. Williams' rate increased "exactly as it was designed to do."  Def.'s Mem. [Doc. 14] at 2.  But faced with the two contradictory sets of Program terms and conditions – one which it claims it sent Mr. Williams in 2008 and one which was posted on its website as recently as December 2011 – TWC is forced to deflect attention and cast aspersions.  In fact, TWC only mentions the contradictory terms and conditions posted on its website in passing, discounting them as "printed after the fact" and distinguishing them from the terms and conditions of the brochure which "applied to *his* [Plaintiff's] package."  Def.'s Mem. [Doc. 14] at 5 (emphasis in original).  Through this argument, TWC appears to suggest that each of its Program customers receive custom terms and conditions and that those, rather than the terms and conditions posted on TWC's website, control.  This is not true.  *See* Agreement [Doc. 14-5] at Intro. (defining "Customer Agreements" to include "Addendums … like our Price Lock Guarantee" and providing that "[o]ur website always contains the most current versions of our Customer Agreements"); at ¶8(a) ("We may change our Customer Agreements by amending the on-line version of the relevant document.").  As the provisions of the Agreement (as well as those of previous versions of the subscriber agreement) make abundantly clear, the terms and conditions posted

on TWC's website govern the parties' relationship over earlier versions. *See, e.g.*, 2003 subscriber agreement [Doc. 14-3] at ¶2(e).

But in the self-serving declaration attached to TWC's memorandum, TWC's Vice President of Marketing explains that TWC "offers different pricing packages in different locales over time" and that TWC "no longer offers the Price Lock Guarantee package offered to Plaintiff." Fordham Decl. [Doc. 14-1] at ¶7. That may very well be true, but the terms and conditions captured from TWC's website in December 2011 were specifically posted in the portion of the website covering the Cincinnati[9] service area in which Mr. Williams resides. *See* Exh. B to Am. Comp. And while TWC no longer offers the deceptive and fraudulent Program to other Ohio customers, this has no bearing on the merits of Mr. Williams' claims.

### B. Mr. Williams Opts Out of Arbitration and Files Suit

After sending TWC written notice of his decision to opt out of the arbitration provision pursuant to Paragraph 15 of the Agreement on September 14, 2011, Mr. Williams initiated this action on September 20, 2011 by filing a complaint asserting claims for breach of contract, promissory estoppel, unjust enrichment, and violation of the Ohio Consumer Sales Practices Act against TWC on behalf of a class of TWC customers. [Doc. 1.] TWC moved to dismiss the action in favor of arbitration on November 21, 2011. [Docs. 6, 7.] In response to TWC's attempt to enforce Paragraph 15 against him, Mr. Williams sent TWC a second arbitration opt out notice on December 14, 2011. *See* Exh. A to Am. Compl. [Doc. 9]. Mr. Williams then filed the currently operative Amended Complaint [Doc. 9] on December 15, 2011, which added a fraud claim and refined his allegations in light of newly discovered information. TWC filed a second motion to dismiss and compel arbitration [Docs. 13, 14] on January 13, 2012.

---

[9]The Program terms and conditions were captured on December 14, 2011, at
http://www.timewarnercable.com/**cincinnati**/learn/bundles/plg.html (emphasis added). *See* Exh. B to Am. Comp.

II.     ARGUMENT

    A. Standard of Review

"A written agreement to arbitrate disputes arising out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"  *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (quoting 9 U.S.C. § 2).  There are a "large number of cases from the Supreme Court encouraging arbitration in a wide variety of contexts and emphasizing the federal policy in favor of arbitration." *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006).  "However, the federal policy in favor of arbitration is not an absolute one.  Arbitration under the Federal Arbitration Act is a matter of consent, not coercion." *Id.* (internal quotes omitted).  "The principal purpose of the FAA is to ensure that private arbitration agreements are enforced *according to their terms*." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748, 179 L. Ed. 2d 742 (2011) (emphasis added and internal quotes omitted).

"[N]o matter how strong the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (internal citations omitted).  Where, as here, "the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Summit Contrs., Inc. v. Legacy Corner, L.L.C.*, 147 Fed. Appx. 798, 800 (10th Cir. 2005).  "Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007).

"Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (internal quotes omitted). Courts must "not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002) (internal citation omitted). TWC, "as the party seeking to enforce the alleged agreement to arbitrate, has the burden of showing that a valid agreement to arbitrate exists." *Tillman v. Macy's Inc.*, No. 11-10994, 2011 U.S. Dist. LEXIS 146728, at *12 (E.D. Mich. Dec. 21, 2011).[10]

### B. Plaintiff Properly Opted Out of Paragraph 15 by Providing Written Notice Within 30 Days of the Date He "First Became Subject to this Arbitration Provision"

At issue is TWC's nebulous phrasing in Paragraph 15(e), which provides that customers who wish to opt out of TWC's arbitration provision must send TWC written notice within 30 days of "first bec[oming] subject to this arbitration provision." TWC moves to dismiss and compel arbitration based on the false presumption that Mr. Williams "first became subject to this arbitration provision" in March 2010 after TWC posted an updated iteration of its subscriber agreement, the Agreement, on its website and subsequently notified its customers of the change by including a small print announcement in the upper right hand corner of the second page of the March 2010 billing statements. Def.'s Mem. [Doc. 14] at 8-9; [Doc. 14-11]. However, this construction is squarely at odds with other terms of the Agreement. Moreover, TWC's interpretation of the phrase "subject to" renders the opt out provision self-defeating and provides many customers no meaningful opportunity to opt out. Furthermore,

---

[10] In its memorandum, TWC repeatedly criticizes Mr. Williams for failing previously to "articulate any valid reason why arbitration is inappropriate." Def.'s Mem. [Doc. 14] at 3, 10-11. TWC's suggestion that Mr. Williams was somehow required to affirmatively plead his defense to a motion TWC had not yet filed finds no basis in the law.

8

TWC's construction of Paragraph 15 runs afoul of well-established canons of contract interpretation, including contra proferentem. Because the only reasonable interpretation of Paragraph 15 is that Mr. Williams "first became subject to this arbitration agreement" when its provisions first became implicated, pertinent, and applicable to him, TWC's motion to dismiss should be denied.

1. Principles governing contract interpretation in Ohio

Under Ohio law, the purpose of contract construction is to "ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997). The intent of the parties is presumed to reside in the language they choose to use in their written agreement. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, paragraph one of the syllabus (1987). In construing a contract under Ohio law, the instrument should be read as a whole with the intent of each part gathered from a consideration of the whole. *Foster Wheeler*, 78 Ohio St.3d at 361-62. Where the terms of a contract are clear and unambiguous, the court cannot find different intent from that expressed in the contract. *E.S. Preston Assoc., Inc. v. Preston*, 24 Ohio St.3d 7, 10 (1986). Common words in a contract will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is apparent from the face or overall contents of the document. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, ¶2 of syllabus (1978).

On the other hand, language in a contract is ambiguous if it is reasonably susceptible of two or more meanings. *McClorey v. Hamilton County Bd. of Elections*, 130 Ohio App.3d 621, 625, 720 N.E.2d 954 (1998). Courts should endeavor to give effect to every part of the contract and therefore "if one construction of a doubtful condition in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain." *Foster Wheeler*, 78 Ohio St.3d at 362. Moreover, an ambiguous contract is to be construed against the party who drafted it. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 314 (1996).

2. <u>Competing definitions for "subject to"</u>

Courts have long recognized that "[t]he term 'subject to' has a variety of definitions depending upon the subject matter in which it is used." *Del Rio Land, Inc. v. Haumont*, 110 Ariz. 7 (1973) (construing land sale sold "subject only to the existing mortgage").[11]  Black's defines "subject to" as "Liable, subordinate, subservient, inferior, obedient to; **governed or affected by**; provided that; provided; answerable for." Black's Law Dictionary 1425 (6th ed. 1990) (emphasis added).  Webster's II New Riverside Dictionary provides similar entries for the adjective form of "subject."[12]  Depending on which definition is applied in a given situation, the resulting meaning can change drastically.  *See, e.g., Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 833 (9th Cir. 1996) (dispute over whether "subject to" a statutory provision means "described by" the provision or "conditioned by" the provision).  As reflected in nearly 100 years of judicial decisions, the phrase "subject to" is both widely used and particularly susceptible to dispute.

3. <u>Jurisdiction-based usage vs. Application-based usage</u>

TWC's motion presupposes that Mr. Williams first became subject to "this arbitration provision" when the Agreement containing it first became effective and binding upon him.  In this sense, because Mr. Williams first fell within the "jurisdiction," "sovereignty," "power," or "dominion" of Agreement, he became "subject to" it.  *See, e.g.,* Webster's Third New International Dictionary 2275 (2002) (defining "subject" as, inter alia, "falling under or submitting to the power or dominion of

---

[11] *See, e.g., Johnson v. Big Lots Stores, Inc.*, 251 F.R.D. 213, 215-17 (E.D. La. 2008) (disagreement among courts over "[s]ubject to Rule 45(c)(3)(A)(ii)" in Fed. R. Civ. P. 45); *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 831-34 (9th Cir. 1996) (construing amendment requiring release of timber sales contracts "subject to section 318 of the Public Law 101-121" to modify the statute's geographic scope, not its temporal reach);  *United States v. De Ortiz*, 910 F.2d 376, 383 (7th Cir. 1990); *Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston*, 666 F.2d 673, 677-84 (1st Cir. 1981); *United States v. 2101 Lincoln Blvd.,* 729 F.Supp.2d 1150, 1153-54 (C.D. Cal. 2010);  *Anderson v. Southwest Sav. and Loan Assoc.*, 117 Ariz. 246, 248 (Ariz. Ct. App. 1977);  *Homan v. Employers Reinsurance Corp.*, 345 Mo. 650, 671 (1940); *Engelstein v. Mitz*, 345 Ill. 48, 61-62 (Ill. 1931).

[12] *See* Webster's II New Riverside Dictionary 671 (rev. ed. 1996) ("1. Under the authority, rule, or power of another. 2. Disposed: prone < subject to infections > 3. Liable < subject to misinterpretation > 4. Dependent: contingent < permission subject to further discussion >").

another" as in "children [subject] to their parents" or "owing allegiance to or being a subject of a particular sovereign or state" or "Obedient, submissive" as in "be [subject] to the laws").  In this broadest sense, every Ohio citizen is "subject to" every provision of the Ohio Revised Code.  Put another way, every newborn baby in the country is "subject to" 42 U.S.C. § 1702 ("Application of Longshore and Harbor Workers' Compensation Act"), as well as every technical regulation promulgated by the Internal Revenue Service, regardless of its subject or its applicability.  Of course, such usage defies convention.  But it nonetheless may be said in the broadest sense that the baby is "subject to" each tax provision because it is the law of the land and the baby falls within in its jurisdiction.  For purposes of this memorandum, TWC's usage of "subject to" will be referred to as "Jurisdiction-based."  TWC's assertion that Plaintiff's opt out notice was untimely presupposes that this Jurisdiction-based usage governs "subject to" for purposes of Paragraph 15 of the Agreement.  TWC, however, is mistaken.

A second and more common meaning of the phrase, "subject to [a particular] provision," is to communicate that a person's actions or circumstances make the given provision directly and particularly applicable to his or her situation.  *See, e.g.*, Black's Law Dictionary 1425 (6th ed. 1990) (defining "subject to" as, inter alia, "Liable," or "governed or affected by"); Oran's Dictionary of the Law 408 (1983) (defining "subject to" as, inter alia, "affected by").  In this sense, a person becomes "subject to" a provision, not when he or she falls within its jurisdiction, but rather when it becomes germane to the situation and governs his or her conduct.  *See, e.g., United States v. McGoff*, 831 F.2d 1071, 1085 (D.C. Cir. 1987) ("The purpose of this proposed amendment … is to permit prosecution of an offender at any time … and not merely within a 3-year period from the time that he ***first became***

*subject to* the law and should have registered but failed to do so.") (internal quotes omitted and emphasis added).[13]

In this more common sense, an Ohio citizen only becomes "subject to" Ohio Rev. Code § 5733.29 ("Underpayment of estimated tax") when that person's circumstances are such that the Code requires him or her to make quarterly estimated tax payments of a certain amount, but he or she fails to do so. *See, e.g., Yoder v. Barnhart*, 56 Fed. Appx. 728, 729 (7th Cir. 2001) ("Yoder also stated on this application that he *first became subject to* self-employment tax in 1974.") (emphasis added). This memorandum will refer to this usage as "Application-based."

As this memorandum demonstrates below, the most rational and reasonable interpretation of Paragraph 15(e)'s language, "first became subject to this arbitration provision," affords the phrase with an Application-based construction. Paragraph 15(a) provides, "Our goal is to resolve Disputes fairly and quickly. However, *if we cannot resolve a Dispute* with you, then, except as described elsewhere in Section 15, each of us agrees to submit the Dispute to the American Arbitration Association for resolution …." Agreement [Doc. 14-5] at ¶15 (emphasis added). Thus, using Application-based construction, Mr. Williams first became "subject to" Paragraph 15 when his dispute with TWC became irresolvable. *Id.*

        4.     <u>As most commonly used by courts and lawyers, a person becomes "subject to" a provision when its dictates apply directly to him or her</u>

The U.S. Supreme Court, like lower courts, routinely states that a person becomes "subject to" a particular statutory provision when that person's actions or another triggering event implicates the provision and makes it directly apply to the person (i.e. Application-based usage). *See, e.g., Hutto v.*

---

[13] *See also Dyco Petroleum Corp. v. ANR Pipeline Co.*, No. 86-C-1097-C, 1988 U.S. Dist. LEXIS 18317, * 5 (N.D. Okla. 1988) ("These contracts provided that should [customers] purchase gas from a non-local source other than ANR, they would automatically *become subject to* the minimum bill requirement.") (emphasis added); *In re Application for the Discipline of Clayton E. Parks, Jr.*, 396 N.W.2d 560, 561(Minn. 1986) ("[Respondent] *first became subject to* attorney discipline procedures in 1973 when he received a private reprimand….") (emphasis added); *United States v. Monroe*, 150 F. Supp. 785, 786 (S.D. Cal. 1957) ("Defendant *first became subject to* the Selective Service System on January 21, 1952, when he registered with [the local board].") (emphasis added).

*Davis*, 454 U.S. 370, 381, (1984) (Brennan, J., dissenting) ("Rummel ***became subject to this*** [habitual offender sentencing] ***provision*** in 1973, when he was convicted [of a third felony].") (emphasis added); *Bradford Elec. Light Co. v. Clapper*, 286 U.S. 145, 152 (1932) ("The [statute] provides that the employer shall ***become subject to*** the workmen's compensation ***provisions*** … only by filing a declaration to that effect….") (emphasis added); *Suey v. Backus*, 225 U.S. 460, (1912) (Syllabus) ("[If a woman] is found violating the statute by being in a house of prostitution she ***becomes subject to*** the deportation ***provisions*** thereof….") (emphasis added); *Solis v. Amalgamated Transit Union,* 638 F.3d 956, 957 (8th Cir. 2011) ("Thereafter, because Local 1005 no longer represented only public employees, it ***became subject to the provisions*** of the [Act].") (emphasis added); *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1234 (5th Cir. 1997) ("There are several ways a person may act as a 'debt collector' or otherwise ***become subject to the provisions*** of the [Fair Debt Collection Practices Act].") (emphasis added); *Bublitz v. Brownlee*, 309 F.Supp. 2d 1, 4 (D. D.C. 2004) ("All parties concede that it was upon plaintiff's promotion to colonel that he ***first became subject to the provisions*** of the Act.") (emphasis added).[14]

Courts' usage of the Application-based meaning is not limited to statutory provisions; courts routinely apply it to contractual provisions as well. *See, e.g., Waldinger Corp. v. CRS Group Eng'rs, Inc*., 775 F.2d 781, 794 (7th Cir. 1985) (Pell J., dissenting) ("Ashbrook … would have ***become subject to those provisions*** of the contract which required Ashbrook to repair or replace equipment which did not satisfy the performance specifications.") (emphasis added); *Welch v. Local 599*, No. 85-CV-40230, 1988 U.S. Dist. LEXIS 16932, *3 (E.D. Mich. Sept. 21, 1988) ("[Defendants] assert that

---

[14] *See also Village of Palatine v. Califano*, No. 77 C 2285, 1979 U.S. Dist LEXIS 11354, at *2 (N.D. Ill. June 28, 1979) ("Plaintiff Village of Palatine and Village of Carol Stream first became subject to these *provisions* in 1955 and 1979, respectively, when their populations reached the 5,000 mark."); *Parnell v. Superior Court of Alameda Cty*., 119 Cal. App. 3d 392, 405 (1981) ("A minor becomes subject to the provisions of the section 300 of the Welfare and Institutions Code by being outside his parents' care and control."); *Adams v. Dickenson*, 264 So. 2d 17, 21 (Fla. Ct. App. 1972) ("When appellant last served as a Justice on the Supreme Court, and mandatorily came under the provisions of Division 'C' for retirement purposes, he then first became subject to the 'election' proviso' therein.").

overtime denial occurred legitimately because the plaintiff had ***become subject to the provisions*** in the collective bargaining agreement applicable to handicapped employees.") (emphasis added); *Seaboard Lumber Co. v. United States*, 41 Fed. Cl. 401, 406 (1998) ("As the damage calculation formula is laid out in the contract, and as plaintiff Capital admits to breaching the contracts, plaintiff thereby ***becomes subject to*** the contractually agreed upon damage calculation ***clause*** C9.4.") (emphasis added); *Inland Drilling Co. v. Davis Oil Co.*, 183 Neb. 116, 120 (1968) ("This [contract] provision became operative only in the event plaintiff ceased work for a period of 5 days.  There is no contention … that plaintiff ever ceased work or ***became subject to this provision***.") (emphasis added); *Davis Gulf Coast, Inc. v. Anderson Exploration Co., Inc*., 933 So. 2d. 227, 230 (La. Ct. App. 2006) ("[B]eing duly notified in writing of its default, Anderson took no steps to timely remedy the default and thus ***became subject to*** the penalty ***provisions*** of the joint Operating Agreement.") (emphasis added).

     5.    The Supreme Court's decision in *Auer v. Robbins* is illustrative

The Supreme Court's decision in *Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997) highlights the importance of not construing the scope of "subject to" too broadly.  *Id*. at 454-55.  In that case, the petitioner police officers sued the respondent police commissioners for overtime pay under the Fair Labor Standards Act.  *Id*.  The respondents argued that the petitioners were exempt from the overtime pay provisions because they qualified as "bona fide executive, administrative, or professional" employees under the Secretary of Labor's salary-basis test, which requires compensation not be "subject to" reduction based on an employee's performance.  *Id*.  The specific question at issue was "whether, under the test, an employee's pay is 'subject to' disciplinary or other deductions whenever there exists a theoretical possibility of such deductions, or rather only when there is something more to suggest that the employee is actually vulnerable to having his pay reduced."  *Id*. at 459.  The petitioners contended that "because the police manual nominally subjects all department employees to a range of disciplinary sanctions that includes disciplinary deductions in pay … they are

14

'subject to' such deductions and hence non-exempt under the FLSA." *Id*. at 460. The Supreme Court rejected this argument, and instead affirmed the Secretary's adoption of a "significant likelihood" test requiring more than the mere theoretical possibility of disciplinary deductions for an employee to be considered "subject to" them. *Id*. at 461-62.

This reasoning applies with full force here. Mr. Williams did not become "subject to" Paragraph 15's arbitration provision in 2010 just because there existed a theoretical possibility that an irresolvable dispute might arise. Instead, Mr. Williams only became "subject to" the arbitration provision when an actual, concrete irresolvable dispute arose in 2011, which triggered the beginning of the 30 day opt out window. Because Mr. Williams successfully opted out during that window, TWC's motion to dismiss must be denied.

> 6. <u>Applying TWC's Jurisdiction-based construction renders the provision internally self-defeating</u>

According to TWC, Mr. Williams' opt out notice was untimely because according to its records, TWC requested a third party vendor to generate and send him a monthly billing statement on or about March 22, 2010 that would have contained a small block of text nominally informing him of the existence of a new subscriber agreement posted on TWC's website. Thus, "presuming the billing statement arrived seven days after its March 22, 2010 statement date and treating March 29, 2010, as the date that Plaintiff received notice of the new agreement," TWC reasons, "Plaintiff's 30-day window to opt out of arbitration expired no later than April 28, 2010." Def.'s Mem. [Doc. 14] at 9.

TWC's reasoning is flawed. First, every version of TWC's subscriber agreement specifically provides that updated versions of the agreement become effective upon being posted on TWC's website, not when notice is provided to customers. *See, e.g.*, Agreement [Doc. 14-5] at Intro. ("Our website always contains the most current versions of our Customer Agreements"); ¶8 ("We may change our Customer Agreements by amending the on-line version of the relevant document …. Any changes to our Customer Agreements are intended to be prospective only. In other words, the

15

amended version of the relevant document only becomes binding on you as of the date that we make the change.") In fact, the Agreement contains no provision requiring customer notice at all. *Id*.[15] And the preceding version of the subscriber agreement – the version whose terms presumably governed TWC's adoption of the current Agreement, *including Paragraph 15* – could not be any more clear on this point. Paragraph 1(c) provides:

> TWC will notify me of any significant change(s) in this Agreement …. <u>Any changes will become effective at such time as we update the on-line version of the relevant document</u>, except where applicable law requires a notice period, in which case the change will become effective at the end of the requisite notice period.

Exh. A to Butler Decl., attached hereto as Exh. 2, at ¶1(c) (emphasis added).[16]

Accordingly, if the "subject to" language of Paragraph 15 is given Jurisdiction-based meaning, as TWC suggests, then Mr. Williams would have had 30 days from the date TWC first posted the new Agreement on its website (a date which TWC has failed to identify in its brief) – not from when Mr. Williams allegedly received constructive notice of the new subscriber agreement via his monthly statement. The distinction is critical, because to interpret "subject to" as TWC suggests would mean that, depending on when in a given customer's billing cycle the subscriber agreement is posted on TWC's website, that customer could have *little or even no* opportunity to opt out. For instance, if TWC first posted the Agreement on its website on February 23, 2010, by the time Plaintiff and all other TWC customers sharing the same statement date received their March 22, 2010 statement containing the announcement (assuming at least a few days for mail delivery), the 30 day opt out

---

[15] TWC points to language on its "opt out web page" suggesting that existing customers have "thirty days from the date you received notice" of the adoption of a new subscriber agreement to opt out. *See* Def.'s Mem. [Doc. 14] at 9; [Doc. 14-10]. However, this language is not from the Agreement, Program terms and conditions, or any other Customer Agreement. Indeed, that language directly contradicts the express terms of TWC's subscription agreements, all of which contain merger provisions. *See, e.g.*, Agreement [Doc. 14-5] at ¶20(a) ("The Customer Agreements constitute the entire agreement between you and TWC. You are not entitled to rely on any agreements or undertakings made by TWC personnel other than those contained in the Customer Agreements.").

[16] This version of TWC's subscriber agreement is archived at http://web.archive.org and accessible through that website's "Wayback Machine." *See, e.g., Santos v. United States*, 559 F.3d 189, 201 n7 (3d Cir. 2009) (citing webpage archived at http://web.archive.org); *Web Tracking Solutions, L.L.C. v. Google, Inc.*, No. 08-cv-03139, 2010 U.S. Dist. LEXIS 143519, at *57 n.25 (E.D.N.Y. July 27, 2010) (same).

window, as interpreted by TWC, would have already closed.  In other words, to apply the Jurisdiction-based meaning to "subject to" would render Paragraph 15(e) internally inconsistent and self-defeating, an absurd result.  *See Foster Wheeler*, 78 Ohio St.3d at 362 ("[I]f one construction of a doubtful condition in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain.").  *See also Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S. 52, 63, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995) (applying "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other.")  Why provide a 30 day opt out provision at all if, by action of the TWC's billing cycle, a significant percentage of TWC's customers would receive little or no meaningful opportunity to opt out?  Because the parties could not have intended such a result, TWC's Jurisdiction-based reading of "subject to" must be rejected.

Moreover, if Paragraph 15 is afforded a Jurisdiction-based construction as TWC suggests, it would require subscribers to opt out each time TWC amends its subscriber agreement, because, after all, with each new iteration of the document, "this provision" necessarily changes.  It is hard to imagine a construction more susceptible to gamesmanship and abuse.[17]

### 7. <u>Contra proferentem supports construction in favor of Mr. Williams</u>

Because Mr. Williams successfully opted out in a timely manner under the only reasonable and internally consistent reading of Paragraph 15, there is no need to apply any presumption in favor of arbitration.  *See, e.g., St. Vincent Charity Hospital v. URS Consultants, Inc*., 111 Ohio App. 3d 791, 794 (Ohio Ct. App. 1996) (refusing to compel arbitration because "while presumptions exist favoring arbitration in the case of uncertainty and requiring a court to construe an ambiguous agreement most strictly against its drafter, we believe such presumptions are invoked only when competing inferences

---

[17] For instance, TWC, anticipating initiation of litigation by a customer who had already opted out of Paragraph 15, could quietly post a new version of the subscriber agreement on its website and immediately restart the opt out clock.

are relatively equal.") (internal quotes omitted). However, should the Court find the language of Paragraph 15 to be ambiguous, the doctrine of contra proferentem supports construction of the provision in favor of Mr. Williams.

Ohio has long recognized the common law rule of contract interpretation that a court should construe ambiguous language against the interest of the party who drafted it. *See McKay Mach. Co. v. Rodman*, 11 Ohio St. 2d 77, 80 (1967); Restatement (Second) of Contracts § 206. The purpose of the rule is to protect the party who did not choose the language from an unintended or unfair result.[18] It is important to recognize that "the federal policy favoring arbitration does not totally displace ordinary rules of contract interpretation. Thus, numerous courts have employed the tenet of contra proferentem in construing ambiguities in arbitration agreements against the drafters." *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 25 (1st Cir. 2000) (distinguishing between ambiguities relating to the scope of an arbitration agreement, where the federal presumption in favor of arbitration applies, and other ambiguities where contra proferentem properly applies); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63 (1995) (applying contra proferentem to choice of law provision of arbitration clause); *Security Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 374 (6th Cir. 1999) (reversing dismissal in favor of arbitration based on contra proferentem).

Ohio courts also routinely apply contra proferentem to ambiguous provisions of arbitration agreements. *See, e.g., Board of Trs. Sabis Int'l Sch. v. Montgomery,* 205 F. Supp. 2d 835, 846 (S.D. Ohio 2002) ("Here, the State drafted the contract. Thus, any ambiguity that might arise from the insertion of the binding arbitration provision must be construed against the State."); *Strickler v. First Ohio Banc & Lending, Inc.,* 2009 Ohio 1422, ¶ 13 (Ohio Ct. App. 2009) (applying contra proferentem

---

[18] *See* Restatement (Second) of Contracts § 206, Comment a (1979) ("Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than those of the other party. He is also more likely … to have reason to know of uncertainties in meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert.").

to arbitration agreement clause prohibiting class arbitration because "[h]ad First Ohio Banc intended only one interpretation of the Agreement, it could have expressly and unambiguously provided such a construction."); *Bennett v. Sunnywood Land Dev., Inc.*, 2007 Ohio 2154, ¶19 (Ohio Ct. App. 2007) (refusing to apply arbitrator selection provision to particular arbitration procedure because "[h]ad Appellant intended to make these provisions applicable when there was only one arbitrator, it could have included such provisions in the section discussing arbitration by a single arbitrator").

There are countless ways in which TWC, as the drafter of the Agreement, could have drafted Paragraph 15 to make it consistent with TWC's preferred construction. For example, TWC could have required Mr. Williams to opt out within 30 days of first becoming subject to this *Agreement.* Or TWC could have abandoned the nebulous "subject to" language altogether. *See, e.g., Freedman v. Comcast*, 190 Md. App. 179, 188 (Md. Ct. Spec. App. 2010) (cable subscriber agreement with opt out deadline of 30 days from "*receipt"* of new agreement).[19] TWC chose not to do so. Accordingly, Paragraph 15 must be construed in favor of Mr. Williams.

## III. CONCLUSION

For the foregoing reasons, TWC's Motion to Compel Arbitration and Dismiss Amended Complaint or, in the Alternative, Stay this Action Pending Arbitration should be denied.

> Respectfully submitted,
> s/Jeffrey S. Goldenberg
> Jeffrey S. Goldenberg (0063771)
> Todd B. Naylor (0068388)
> Robert Sherwood (0084363)
> Goldenberg Schneider, LPA
> One West Fourth Street, 18th Floor
> Cincinnati OH 45202-3604
> Telephone: (513) 345-8291
> Facsimile: (513) 345-8294
> jgoldenberg@gs-legal.com
> tnaylor@gs-legal.com
> rsherwood@gs-legal.com

---

[19] *See also Nefores v. Branddirect Mktg*., 2004 Ohio 5006, ¶33 (Ohio Ct. App. 2004) (agreement setting specific opt out deadline date); *Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1081 (9th Cir. 2008) (26 days after statement date).

19

          Christian A. Jenkins
          Minnillo & Jenkins, Co. LPA
          2712 Observatory Avenue
          Cincinnati, OH 45202
          Telephone: (513) 723-1600
          Facsimile: (513) 345-1620
          cjenkins@minnillojenkins.com

## **CERTIFICATE OF SERVICE**

  I hereby certify that on February 6, 2012, I electronically filed the foregoing Plaintiff JohnWilliams' Memorandum In Opposition To Defendant Time Warner Cable Inc.'s Motion To Compel Arbitration And Dismiss Amended Complaint Or, In The Alternative, Stay This Action Pending Arbitration with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

          s/Jeffrey S. Goldenberg_____
          Jeffrey S. Goldenberg