**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **JOHN WILLIAMS, on behalf of himself and all others similarly situated,** | |
| **Plaintiff,** | **Case No. 1:11-cv-00647-SSB-SKB** |
| **v.** | **Judge: Sandra S. Beckwith** |
| **TIME WARNER CABLE INC., and ABC COMPANIES, 1-100,** | **Magistrate Judge: Stephanie K. Bowman** |
| **Defendants.** | |

**DEFENDANT TIME WARNER CABLE INC.'S REPLY BRIEF IN SUPPORT OF
MOTION TO COMPEL ARBITRATION AND DISMISS AMENDED COMPLAINT,
OR, IN THE ALTERNATIVE, STAY THIS ACTION PENDING ARBITRATION**

**I.      INTRODUCTION**

The plaintiff does not contest that his claims fall within the scope of the mandatory

arbitration provision in his Subscription Agreement with Defendant Time Warner Cable Inc.

("TWC"); that this mandatory arbitration provision is valid and enforceable as written; and that

his Complaint should be dismissed if his claims are subject to arbitration.  Those determinations

stand unchallenged.  Instead, the plaintiff's sole basis for refusing to comply with the arbitration

agreement is his argument that he "opted out" of the arbitration provision one week before he

filed his lawsuit or, alternatively, after TWC moved to compel arbitration.  At best, those

attempts came sixteen months too late, because his opt-out window closed in April 2010.

The plaintiff's novel interpretation of the arbitration provision—hypothetically allowing

him to "opt out" of arbitration whenever he elects to do so years after he entered the contract—

fails on multiple grounds.  At the outset, under the contract and settled federal law, the arbitrator,

not the Court, should decide the merits of the plaintiff's opt-out argument.  The Subscription

Agreement provides that the arbitrator should decide any questions regarding <u>whether</u> the plaintiff's dispute is arbitrable.  The plaintiff never discusses, much less disputes, that contract provision, which requires that the scope and applicability of the opt-out provision should go to arbitration in the first instance.

Moreover, even if the Court were to decide the issue, the plaintiff's contract theory cannot withstand careful analysis.  That novel theory is inconsistent with a long line of federal cases upholding opt out provisions similar to TWC's provision, ignores the undisputed parol evidence that governs here, ignores the plain language of the contract itself, creates an unwieldy and unworkable framework for applying the opt-out provision to disputes after-the-fact, and undermines the strong federal policy favoring arbitration.

Indeed, the plaintiff's contract argument is wholly unsupported in the case law and inconsistent with multiple federal decisions.  The plaintiff cites no case—not one—finding that an opt-out period in an arbitration agreement starts to run when a dispute arises or becomes irresolvable or when an arbitration clause is first invoked with respect to a particular dispute.  To the contrary, numerous federal courts have held just the opposite, routinely finding that opt-out windows in arbitration agreements start to run when a party first receives notice of or first accepts the agreement.

Finally, even if we were to "step into the plaintiff's view of the world," the plaintiff's theory would at most require additional discovery and then a trial to determine exactly what triggering events should govern under his theory and whether the plaintiff timely opted out under that new standard, including, among other things, when the plaintiff knew or should have known that he had a "dispute" with TWC, when he first consulted counsel, when he concluded the matter could not be resolved, and what facts he had regarding his litigation options, all of which

would need to be heard and decided by the arbitrator.  Thus, even under the plaintiff's own

theory, the action should be dismissed or stayed pending resolution of those issues in arbitration.

Under any scenario, therefore, the Court should compel arbitration and dismiss or stay this

lawsuit.[1]

## II.  <u>ARGUMENT</u>

### A.  **The Arbitrator Should Decide The Issue Raised By The Plaintiff.**

As set forth below, TWC contends that the opt out provision is clear and easily

determined:  The date on which "you first became subject to" a contract provision is the date on

which you entered into the contract or agreed to be bound by it.  That interpretation is

straightforward, makes sense, is consistent with the plain language of the contract, is supported

by parol evidence, and conforms with federal law.  The plaintiff's argument, on the other hand,

contravenes the terms of the Subscription Agreement, is inconsistent with case law, is

unworkable, and should be rejected.  But, regardless of the merits of those arguments, the

arbitrator should decide them.  The proper scope of the opt-out provision, its applicability to this

dispute, and any factual questions relating to its applicability are all questions for the arbitrator to

resolve.

---

[1] Both parties agree that the merits of the plaintiff's claims are not presently before this Court.  In its original motion—TWC's first response to the plaintiff's Amended Complaint—TWC set forth the factual background behind the plaintiff's claim, a background that on its face exposes that the plaintiff's claim is fundamentally flawed.  The plaintiff's response (*see* Resp. at 3-6)—which comes despite a pledge not to engage TWC on the merits (*see* Resp. at 2 n.4)—does nothing to resuscitate his claims.  As much as the plaintiff clamors for more, TWC does have proof that the plaintiff received the terms and conditions that expressly provided that his rate would increase at month 13 of his 24-month Price Lock Guarantee term (see Motion Ex. 1, 1/13/12 Fordham Dec., at ¶ 5 & Ex. E, F), which price increase is the only basis for this lawsuit.  Nothing in those terms and conditions contradicts this clear statement, and the plaintiff was free to cancel his Price Lock Guarantee package without penalty after he received this notice.  Moreover, the plaintiff received a letter when his Price Lock Guarantee package renewed in March 2009, again expressly notifying him of the price increase, and again enclosing terms and conditions that did the same.  (*See id*. at ¶ 6 & Ex. E, G.)  The plaintiff cites to a different website version of Price Lock Guarantee terms and conditions.  But the plaintiff cannot deny that he received the proper terms and conditions applicable to his package, both when his Price Lock Guarantee package first started and when it was renewed.  Of course, these are matters for the arbitrator to decide if and when the plaintiff brings his claims in arbitration, assuming the plaintiff can circumvent the one-year limitations period in the Subscription Agreement.  For now, the Court should compel arbitration and dismiss this case.

Here, the Subscription Agreement unambiguously provides that "[t]he arbitrator will decide whether a dispute can be arbitrated."  (Ex. D at ¶ 15.)[2]  The plaintiff makes no challenge as to the enforceability or validity of the arbitration agreement as written, but then proceeds to ignore that provision.  That provision is dispositive of the procedural issue present here.  As TWC explained in its Motion at 18-19, where the parties "have clearly and unmistakably vested the arbitrator with the authority to decide the issue of arbitrability, the question of whether a matter is arbitrable is to be decided by the arbitrator."  *Belmont Cnty. Sheriff v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 820 N.E.2d 918, 921 (Ohio 2004); *see also Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 769 (E.D. Mich. 2010).

In this case, the plaintiff makes no challenge to the enforceability of the arbitration provision, but contends that his "dispute" is not arbitrable because he "opted out" of the arbitration clause at least as to his current dispute.  Stated differently, the plaintiff does not dispute that a valid agreement exists as written, but instead argues that, pursuant to that agreement, his opt right began later in time.  TWC, on the other hand, contends that (1) the plaintiff's "dispute" is arbitrable because the plaintiff badly misconstrues the opt-out clause; and (2) even if the plaintiff's interpretation were adopted in some form, his opt-out attempts were nonetheless untimely, because the plaintiff knew or should have known that he had a "dispute" with TWC long before he sent his opt-out letters.  Those are all matters for the arbitrator to decide.

"Consistent with the express language of the arbitration clause [at issue here], it is for the arbitrator, and not the courts, to decide whether the parties have an agreement for arbitration that encompasses the dispute between them."  *Cheney v. Sears, Roebuck & Co.*, 2005-Ohio-3283,

---

[2] References to lettered exhibits refer to the exhibits attached Robert Fordham's January 13, 2012 declaration, which was attached as Exhibit 1 to TWC's memorandum in support of its Motion to Compel Arbitration ("Motion," Dkt. No. 14).

¶ 13, 2005 Ohio App. LEXIS 3052 (Ohio Ct. App. 2005) (affirming stay of case when arbitrator found some claims arbitrable); *see also Toledo Techs., Inc. v. INA Walzlager Schaeffler Kg*, 1999 U.S. Dist. LEXIS 13415, at *7 (N.D. Ohio June 15, 1999) ("[I]f the parties agreed that an arbitrator should decide the threshold question of arbitrability, a court must defer to the arbitrator on that issue."); *Union Twp., Clermont Cty. v. Union Twp. Professional Firefighters' Local 3412*, 756 N.E.2d 204, 209 (Ohio Ct. App. 2001) (A "court does not determine the issue of arbitrability where the contract itself reserves the question of arbitrability for the arbitrator."). The plaintiff's brief ignores the most important clause in the Subscription Agreement—namely, that the arbitrator will decide whether the plaintiff's dispute is arbitrable.  That provision governs here.  Accordingly, separate and apart from the merits of the plaintiff's arguments, the arbitrator should decide the question now before the Court.

> **B. Under The Plain Terms Of The Contract, The Plaintiff's Opt-Out Window Expired In April 2010.**

Even if the Court elects to decide the issue presented by the plaintiff, TWC submits that the opt out provision clearly expired under any reasonable interpretation of the contract.  The purpose of the arbitration clause is so that the parties can resolve disputes "fairly and quickly." (Ex. D at ¶ 15(a)).  That policy favors a clear and simple application of the opt-out provision. The opt-out clause in the Subscription Agreement provides as follows:

> You may opt out of this agreement's arbitration provision. If you do so, neither you nor TWC can require the other to participate in an arbitration proceeding. To opt out, you must notify TWC in writing <u>within 30 days of the date that you first became subject to this arbitration provision</u>. You must use one of these addresses to opt out:
>
> Time Warner Cable
> 60 Columbus Circle, Rm 16-364
> New York, NY 10023
> Attn: Arbitration Opt-out
>
> <u>or</u>

http://www.timewarnercable.com/arbitrationoptout

You must include your name, address and TWC account number and a clear statement that you wish to opt out of this Agreement's arbitration obligation.

(Ex. D at ¶ 15(e) (emphasis added).)

As TWC explained in its Motion, the plaintiff first became subject to the arbitration provision in March 2010, when, as an existing customer, the Subscription Agreement that he was subject to was modified to include the opt-out provision. He received notice of the new terms, including the new arbitration provisions and opt-out right, and elected to continue using TWC's services after such notice.[3] That is the way such provisions commonly operate. To remove any doubt, TWC's arbitration opt-out web page makes clear how the provision is applied:

Q:    How long do I have to opt out?

A:    If the agreement containing the "opt out" right was in effect when you became a Time Warner Cable customer, then the 30-day period begins on the date you began to receive our services. If you were an existing customer when the agreement came into effect, you have thirty days from the date you received notice of the company's adoption of the new agreement. This notice would have been included in your billing statement.

(Ex. I.)

Accordingly, the plaintiff had 30 days from receipt of his March 2010 billing statement to opt out of arbitration. April 2010 came and went without any attempt by the plaintiff to opt out of arbitration. By the end of April 2010, the issue as to whether the plaintiff had opted out of his arbitration agreement had been determined, which makes sense as a matter of practice and contract law. Disputes between the plaintiff and TWC could hardly be handled "fairly and quickly" if the plaintiff were able to opt out whenever he pleased or if every opt-out required

---

[3] The plaintiff's characterization of this notice as "small-print" is disingenuous. (*See* Resp. at 2.) As the Court can see for itself (*see* Ex. J), the notice appeared in the top right portion of the second page of a two-page billing statement, in a column specifically reserved for announcements to the customer, under a heading in all caps that implored the plaintiff to "LOOK HERE." In any event, the plaintiff makes no argument, nor could he, that he received inadequate notice of the opt-out provision.

extensive litigation to resolve the straightforward question.  Here, the plaintiff did not opt out in a timely manner.  Thus, all future claims within the scope of the provision were required to be brought in arbitration pursuant to the parties' agreement.

    **C.**    **The Plaintiff's Position Is Unsupported By Any Case Law, Contradicts The Plain Language Of The Contract, Ignores The Undisputed Parol Evidence, And Is Unworkable.**

    **1.**    **The Plaintiff's Position Contradicts Federal Law.**

The plaintiff fails to cite a single case that adopts his position.  Based on the decisions cited by the plaintiff and TWC's own inquiries, no court has ever held that an agreed arbitration opt out right of the type present here <u>never</u> expires until a dispute arises "and/or" a party "attempts" to "invoke" arbitration as the plaintiff contends.  Nor would that make any sense as a matter of policy.

To the contrary, federal courts have routinely adopted just the opposite, finding that a time-limited opt-out window in an arbitration agreement starts to run when a party first receives notice of or first accepts the agreement, rather than when a dispute arises or an arbitration clause is first invoked for a particular dispute.  *See Legair v. Circuit City Stores, Inc.*, 213 F. App'x 436, 439 (6th Cir. 2007) (affirming order compelling arbitration when the plaintiff failed to exercise his option to opt out of arbitration within 30 days of receiving arbitration program information); *Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199 (9th Cir. 2002) (same); *Passmore v. Discover Bank*, 2011 U.S. Dist. LEXIS 123918, at *17-18 (N.D. Ohio Oct. 26, 2011) (applying Delaware law and granting motion to compel arbitration where credit card agreement contained an arbitration clause with a 30-day opt-out period, use of the card constituted acceptance of the agreement, and the plaintiff did not opt out within 30 days of receiving her card); *Losapio v. Comcast Corp.*, 2011 U.S. Dist. LEXIS 42257, at *10-11 (N.D. Ga. Apr. 18, 2011) (compelling arbitration of claims against a cable company, finding that the plaintiff did not timely opt out of

arbitration where the opt-out provision was limited to 30 days after receipt of a subscription agreement and the plaintiff attempted to opt out more than two years after the 30-day window had expired); *Giles v. GE Money Bank*, 2011 U.S. Dist. LEXIS 111018, at *2-3 (D. Nev. Sept. 27, 2011) (credit card holder did not opt out during any of three 60-day opt out periods, each of which was triggered by an amendment to the arbitration agreement); *Meyer v. T-Mobile USA Inc.*, 2011 U.S. Dist. LEXIS 108249, at *14-15 (N.D. Cal. Sept. 23, 2011) (compelling arbitration where plaintiff did not opt out of service agreement within 30 days of activation of service).  Thus, the plaintiff's position is not only unsupported, but inconsistent with multiple federal decisions.[4]

> ## 2.  The Plaintiff's Position Ignores The Undisputed Parol Evidence, Which Is Dispositive Here.

As noted elsewhere, TWC maintains that, under federal law and any reasonable interpretation of the opt out clause, the contract provision is clear and the plaintiff failed to comply with it.  But, even if TWC "stepped into the plaintiff's world" for the sake of argument and assumed the opt-out clause was somehow ambiguous, his argument fails as a matter of law because it ignores the undisputed parol evidence, which is dispositive here.

The plaintiff cites to a wide array of contract cannons and principles, but disregards the one contract principle that really matters here if the contract is ambiguous as he contends:  In Ohio, "[i]t is axiomatic that, where a contract is ambiguous, parol evidence may be employed to

---

[4] Likewise, none of Plaintiff's cited cases involving arbitration opt-out clauses found that the opt out period began to run when the dispute arose or became irresolvable, or when an arbitration provision was first invoked.  *See, e.g.*, *Freedman v. Comcast Corp.*, 988 A.2d 68, 74 (Md. Ct. Spec. App. 2010) (finding that after receiving notice in his bill of a new arbitration provision with a 30-day opt-out window, the customer "paid the bill containing this insert and he did not choose to opt out of the new arbitration provision within the allotted time"); *Nefores v. BrandDirect Mktg.*, 2004-Ohio-5006, ¶ 33, 2004 Ohio App. LEXIS 4607 (Ohio Ct. App. 2004) (finding that an arbitration agreement with an opt-out window limited to the first couple months after notice of amendment was procedurally conscionable, but the agreement was substantively unconscionable for reasons unrelated to opt-out); *Hoffman v. Citibank (S.D.) N.A.*, 546 F.3d 1078, 1081 (9th Cir. 2008) (opt-out window ran from statement/closing date of the billing statement that provided notice of amendment; case remanded for consideration of whether under California law, the particular notice procedure provided meaningful opportunity to opt out).

resolve the ambiguity and ascertain the intention of the parties." *Illinois Controls, Inc. v. Langham*, 639 N.E.2d 771, 779 (Ohio 1994).  Here, TWC's opt-out website explains to customers exactly when the opt-out period begins to run for existing customers—i.e., 30 days after they receive notice of the company's adoption of the new agreement.  (*See* Ex. I.)

The plaintiff has no answer to this clear explanation other than to assert that it is not a part of the Subscription Agreement itself.  That is the extent of the plaintiff's argument and it is of no import here.  The website is not part of the contract, but that misses the point.  Even if the opt-out clause were "nebulous" as the plaintiff claims (*see* Resp. at 8), TWC's website's constitutes undisputed parol evidence resolving any ambiguity.  The plaintiff cites to no other parol evidence to question or contradict TWC's clear interpretation.  The plaintiff introduces <u>no other parol evidence himself</u>.  And the plaintiff does not argue or contend that TWC's website is somehow ambiguous.  Thus, even if the opt-out language did not clearly support TWC's position, the only parol evidence presented to the Court would be dispositive here.

### 3.    The Plaintiff's Position Is Incoherent And Unworkable.

In an effort to present an alternative contract construction, the plaintiff cites to the language in his arbitration provision that he must opt out "within 30 days of the date that you first became <u>subject to</u> this arbitration provision."  Claiming ambiguity and citing to general cannons of contractual interpretation, the plaintiff concludes that he did not become "subject to" the arbitration provision until the provision "first became invoked, implicated, and applicable to his circumstances," which occurred "when an irresolvable dispute with TWC arose and/or when TWC first attempted to apply the arbitration provision to Mr. Williams."  (Resp. at 2.)

The plaintiff can offer no date certain when these arbitrarily defined events occurred and, in fact, the plaintiff sent not one, but two supposed opt-out letters apparently under the theory that the opt out date continued to run at different points in time.  We are left to presume that the

trigger date must have occurred fewer than 30 days before either his September 14, 2011 or December 14, 2011 opt-out attempts.[5]  Ultimately, however, this attempt to bridge his sixteen-month delay in opting out falls flat.

Indeed, the plaintiff himself seems conflicted as to when the opt-out period began.  His best effort at defining when his opt-out window began is "when an <u>irresolvable dispute</u> with TWC arose <u>and/or</u> when TWC first <u>attempted</u> to apply the arbitration provision to Mr. Williams."  (Resp. at 2.)  But when did his dispute arise?  When did it become irresolvable?  Which one of these events controls?  Has his dispute yet become "irresolvable" and, if not, is it still too early for him to opt out of arbitration?  Despite the Subscription Agreement's provision requiring the plaintiff to bring billing disputes to TWC's attention within 30 days, the plaintiff never brought his alleged dispute to TWC's attention or attempted to resolve it.  Rather, he simply filed a class action lawsuit.   Does his unilateral decision to do so without consulting TWC constitute an "irresolvable dispute"?

Does the fact that TWC informed the plaintiff of the arbitrability of his claims, or moved to compel arbitration, start the clock <u>anew</u>, or are these events all prerequisites to opting out?  What happens when a new or different dispute arises?  Does the clock start anew as to <u>that particular dispute</u>?  The plaintiff's incomplete interpretation provides no answers to any of these questions, which only become relevant when the opt-out clause is wrongly interpreted as the plaintiff attempts to do.  Nor can the plaintiff offer any coherent rationale for defining "subject to" in that manner.

---

[5] Before filing his Response on February 6, 2012, the plaintiff never mentioned any attempt to opt out of arbitration before December 14, 2011, despite TWC's claims of arbitrability in correspondence with the plaintiff and in filings in this Court dating back to November 21, 2011.  Indeed, in response to TWC's first motion to compel arbitration, the plaintiff filed an Amended Complaint addressing the arbitration clause by attaching his December 14, 2011 opt-out attempt and never mentioning any earlier attempt to opt out.  For the first time in his Response, the plaintiff attaches a new opt-out attempt dated September 14, 2011, but that opt-out attempt was likewise still sixteen months too late.

Moreover, under the plaintiff's approach, a customer always can opt out of arbitration, at his or her sole discretion, even years after the customer agreed to be bound by the Subscription Agreement, as long as a new dispute arises, or perhaps becomes newly irresolvable.  Or, if a given dispute lingers for years, the customer could still potentially opt out later if TWC then tried to "invoke" the arbitration clause.  Meanwhile, TWC apparently remains bound by the arbitration clause so the plaintiff retains the <u>unilateral right</u> to decide the arbitration question potentially years after-the-fact.  None of that is consistent with the contract or the parties' intent.  To the contrary, the contract was designed to resolve the opt-out question thirty days after the customer received notice of the new contract.

### 4.    The Plaintiff's Interpretation Is Inconsistent With The Plain Language Of The Subscription Agreement.

The plaintiff's theory simply does not fit the plain language of the Subscription Agreement.  At the outset, the language of the agreement says "within 30 days of the <u>date</u> that <u>you first became</u> subject to this arbitration provision."  It is the "date" on which "you" became subject to the agreed terms, not the date on which a "dispute" became subject to the agreed terms, as the plaintiff appears to contend.  In plain language, "you" become subject to a contract when you enter into that contract or agree to be bound by it.  Similarly, instead of stating "the time that you <u>become</u> subject to the arbitration provision," the opt-out time starts to run at "the time when you <u>first became</u> subject to the arbitration provision."  The use of the past-tense "became" and the adverb "first" makes clear that the opt-out period was meant to run from a date <u>in the past</u>, rather than from some undefined date <u>in the future</u> as different disputes mature.

Moreover, the language states that if "you" opt out, "neither you nor TWC <u>can require</u> the other to participate in an arbitration proceeding."  The obvious intent is that, once the opt-out period expires, either party can <u>compel</u> arbitration by the other party.  The plaintiff's

interpretation, however, renders all that language meaningless.  In the plaintiff's view, he can decide whether to arbitrate after TWC tries to invoke arbitration, which means he is never required to arbitrate anything.  That argument cannot be squared with the terms of the Subscription Agreement.

Similarly, the first page of the Subscription Agreement describes the arbitration provision as something that the parties are agreeing to do and describes the opt out right as a right in the present, not as some contingent right that matures in the future.  (*See* Ex. D at 1.)  That provision expressly states:  "THIS AGREEMENT CONTAINS A BINDING ARBITRATION CLAUSE, WHICH SAYS THAT YOU AND TWC AGREE TO RESOLVE CERTAIN DISPUTES THROUGH ARBITRATION.  YOU HAVE THE RIGHT TO OPT OUT OF THIS PART OF THE AGREEMENT."  (*Id*. (emphasis added).)  The parties are clearly "agree[ing]" to "binding" arbitration under the contract, subject to the 30 day opt out period.  They are not deferring the question of arbitration to some undefined period several years into the future.  Indeed, under the plaintiff's interpretation, the plaintiff agreed to nothing, except to decide at some future date (potentially five years after the agreement) whether or not he wishes to pursue arbitration for a specific dispute.  That is inconsistent with the plain language of the agreement.

Likewise, the plaintiff's interpretation is inconsistent with the use of the singular term "arbitration obligation in the Subscription Agreement," which supports a one-time-only approach to opting out.  (*See* Ex. D at ¶ 15(e) ("You must include your name, address, and TWC account number and a clear statement that you wish to opt out of this Agreement's arbitration obligation.").)  Under the plaintiff's view, however, different arbitration obligations arguably arise at different points in time as different disputes reach the requisite level of maturity.  No language supports that construction.

Had the parties desired to adopt something akin to the plaintiff's interpretation, they could have easily done so, using the type of language that was used in Section 14 of the Subscription Agreement.  Section 14 provides that the customer waives the right to commence proceedings against TWC if the underlying events occurred more than one year earlier. Section 14 then states:  "This waiver is not enforceable, and the normal statute of limitations in your area will apply, if you notified TWC in writing of the events giving rise to the proceedings within one year of their occurrence." (Ex. D at ¶ 14.)  If TWC had intended the arbitration opt-out period to be triggered by events giving rise to a dispute or a party's decision to invoke the arbitration clause, it would have simply worded the arbitration opt-out clause to do so in a straightforward manner.  No such language was used because no such provisions were adopted.

### 5.      The Plaintiff's Position Rests On A False Dichotomy.

In an effort to create support for its unusual theory, the plaintiff creates a false dichotomy that seeks to create two types of "subject to" theories—a "jurisdiction based" theory and an "application based" theory—and then purports to discard the wrong one.  The plaintiff argues that TWC adopts a "jurisdiction-based" approach in which a person is "subject to" a provision simply by falling within the "jurisdiction, sovereignty, power, or dominion" of the provision. (Resp. at 10 (punctuation omitted).)  Under that approach, the plaintiff theorizes that "every newborn baby in the country is 'subject to' 42 U.S.C. § 1702 ('Application of Longshore and Harbor Worker's Compensation Act') . . . ." (*Id*. at 11.)  Conversely, the plaintiff asserts that his interpretation of "subject to" is an "application-based" approach in which "a person becomes 'subject to' a provision, not when he or she falls within its jurisdiction, but rather when it becomes germane to the situation and governs his or her conduct." (*Id*.)

No such labels apply here.  The plaintiff incorrectly characterizes both TWC's theory and his own theory.  Although the plaintiff tries to label TWC's argument as the jurisdiction-based

approach, TWC does not contend that the plaintiff was subject to the arbitration provision simply by falling within any particular "jurisdiction, power, or dominion" or merely by being a resident of a city in which TWC had a cable franchise.  To the contrary, the plaintiff became subject to the arbitration provision <u>when he received notice of it and elected to enter into the contract</u>.  The plaintiff received notice of the new agreement, including the arbitration provision, and opted to continue TWC's services.  The Agreement makes clear that such circumstances constitute acceptance of the new Subscription Agreement, which the plaintiff does not dispute.  (*See* Ex. D. ¶ 8(b).)  At that point, to use the plaintiff's words, the arbitration provision became "germane to the situation and governs his or her conduct."  (Resp. at 11.)

TWC's use of the phrase "subject to"—based on when the party first entered into an agreement—is commonly used and well supported in the case law.  *See, e.g.*, *Peters v. Mo. Pac. R.R. Co.*, 483 F.2d 490, 493 (5th Cir. 1973) ("White firemen first became subject to compulsory retirement in 1959, when an agreement was negotiated with unions representing some of them providing for retirement at 70."); *Wis. v. AT&T Corp.*, 217 F. Supp. 2d 935, 937 (W.D. Wis. 2002) ("Among the terms of the Consumer Services Agreement are provisions that permit defendant to unilaterally change prices and charges with limited notice, <u>require arbitration of disputes</u>, preclude class actions and require application of New York law.  Subscribers who continued to use defendant's services after August 1, 2001 <u>became subject to</u> the terms of the Consumer Services Agreement.") (emphasis added); *Kingsley Capital Mgmt., LLC v. Sly*, 2011 U.S. Dist. LEXIS 120555, at *6 (D. Ariz. Sept. 30, 2011) (plaintiff "became subject to the arbitration clause" in a company's operating agreement in July 2008 when he joined the company, before any dispute arose).[6]

---

[6] *See also, e.g.*, *Crisan v. A.G. Edwards & Sons*, 1996 U.S. Dist. LEXIS 21948, at *2 (N.D. Cal. Feb. 12, 1996) ("Crisan registered with the New York Stock Exchange ('NYSE') and therefore became subject to Rule 347 of the NYSE Rules of Arbitration."); *Jaguar Trading, Ltd. v. Parks*, 2008 Phila. Ct. Com. Pl. LEXIS 176, at *3 (July

Nor is the plaintiff's theory an "application-based" theory, as the plaintiff contends. To the contrary, the plaintiff's theory claims that the "subject to" language becomes operative only when the plaintiff identifies a dispute, concludes it cannot be resolved, faces an arbitration demand, and decides which options it wishes to pursue in the face of that arbitration demand. That is neither "jurisdiction based" nor "application based." Instead, it seeks to morph the contract's mutually binding arbitration term into a unilateral discretionary option for the future that renders the arbitration agreement meaningless. To continue the plaintiff's analogy, under his novel approach, a newborn baby is not 'subject to' the longshoreman's workers compensation statute by virtue of being born or even by virtue of working as a longshoreman under the statute. Rather, the newborn-baby-turned-longshoreman only becomes 'subject to' the statute when he injures himself on the dock, concludes the dispute is irresolvable, and unilaterally decides which provisions should apply to him in his discretion.[7]

That approach makes no sense, and the plaintiff's cases offer no meaningful support for it. Indeed, in the plaintiff's lead case, *Auer v. Robbins*, 519 U.S. 452 (1997), the Supreme Court came to a different conclusion. In *Auer*, one factor for determining whether an employee's pay was "salary-based" (and therefore exempt from FLSA overtime payment rules) was whether it

---

(continued…)

2, 2008) (confirming an arbitration award in which arbitrator found that "[b]y signing the 'attorney acknowledgement' [i.e., a form that acknowledged a contemporaneous agreement between two parties that contained an arbitration provision], Parks became subject to the jurisdiction of this forum (Arbitration)."); *City of Cranston v. Int'l Bhd. of Police Officers, Local 301*, 2005 R.I. Super. LEXIS 36, at *25 (Apr. 1, 2005) ("Once those benefits were carried over to and appeared in the CBA, they became subject to the grievance and arbitration provisions of the contract under Articles/Sections 22 and 23."); *McFadden v. Ky. Unemployment Ins. Comm'n*, 588 S.W.2d 711, 712 (Ky. Ct. App. 1978) (distinguishing between "the time the employee first becomes subject to the retirement plan" and "the actual time of retirement.")

[7] Moreover, given the Subscription Agreement's explicit language that the opt-out period expires 30 days from the "date that you first became subject to the arbitration provision," the plaintiff faces a Catch-22 in applying his theory. If he applies it to each new dispute as it arises, the opt-out right and the opt-out process would continue ad infinitum as new disputes are discovered, assuming workable standards could even be created for deciding such questions. If he applies his theory only to the first dispute, that would undermine his own "application-based" argument, since his own theory would "unfairly" bar customers from opting out of future disputes even if they just discovered that a new or different dispute "applied" to them. Neither theory makes sense here as a matter of policy or law.

was "subject to" disciplinary or other deductions.  *Id.* at 459.  The Court did not find that the employee is "subject to" deductions only when he or she actually incurs a deduction, as would be necessary to support the plaintiff's approach.  To the contrary, the Court accepted the Secretary of Labor's approach, which "reject[ed] a wooden requirement of actual deductions" and instead required "a clear and particularized policy—one which 'effectively communicates' that deductions will be made in specified circumstances."  *Id.* at 461.  In other words, in *Auer*, the employees were "subject to" potential deductions long before a situation arose in which a particular employee could in fact see his or her pay deducted.

The plaintiff's other cases submitted in support of his "subject to" interpretation (*see* Resp. at 11-14) fare no better.  In <u>none</u> of those cases did a court engage in any intentional interpretation of the phrase "subject to," let alone actually hold that "subject to" comports with the plaintiff's interpretation.  None of those cases apply here.  If anything, many of those cases support the common sense conclusion that a party becomes "subject to" a provision long <u>before</u> any dispute arises.[8]

In short, the language of the opt-out clause allows each customer a one-time 30-day opportunity to opt out of arbitration beginning when the customer first receives notice of his or her opt-out right.  The plaintiff's alternative interpretation, in which the opt-out provision never expires until the customer identifies a dispute and meets other undefined and unworkable conditions, finds no support in the law or common sense.

---

[8] *See, e.g.*, *Solis v. Amalgamated Transit Union, Local 1005*, 638 F.3d 956, 957 (8th Cir. 2011) (union became "subject to the provisions of" the Labor Management Reporting and Disclosure Act in October 2007, when the union started representing non-public employees and thus was within the "scope" of the Act); *Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 4 (D.D.C. 2004) ("All parties concede that it was upon plaintiff's promotion to colonel [in March 1999] that he first became subject to the provisions of the [Reserve Officer Personnel Management] Act"); *United States v. Monroe*, 150 F. Supp. 785, 786 (S.D. Cal. 1957) ("Defendant first became subject to the Selective Service System on January 21, 1952, when he registered with [the local board]," even though he was not actually drafted into service until July 1956.)

**D.      TWC's Approach Provides A Clear And Workable Opt-Out Provision.**

The plaintiff tries to argue that TWC's approach could leave some customers without a meaningful opportunity to opt out of arbitration, but that is not true.  In essence, the plaintiff asserts that a new version of the Subscription Agreement could get posted to TWC's website and yet customers may not receive notice of the new version until more than 30 days later.  (*See* Resp. at 15-17.)  That argument falls flat for the simple reason that it ignores the clear language of TWC's policy, which provides that the 30 day opt-out window begins after the customer receives notice of the new agreement.  Thus, the plaintiff's hypothetical alternative is wholly inapplicable here.

In fact, ironically, it is the plaintiff's approach that could cause timing problems for customers wishing to opt out of arbitration.  The Subscription Agreement defines dispute to include any dispute "based on events that occurred prior to the date of this Agreement."  (Ex. D. at ¶ 16 (emphasis added).)  If the opt-out period is defined by some dispute-triggered event or alleged communications over arbitration, the opt-out period for a particular dispute—under the plaintiff's theory—could have been triggered and *expired* before the opt-out clause was even added to the Subscription Agreement.  Of course, this makes no sense.  In contrast, TWC's approach gives each customer a clear and meaningful opportunity to opt out of arbitration after the customer first learns of the opt-out right.[9]

**E.      Any Doubt Should Be Resolved In Favor Of Arbitration.**

Finally, to the extent that there is any doubt as to which interpretation is appropriate, and to extent that doubt is not resolved by the dispositive parol evidence, such doubt should be

---

[9] Whether the parties use the date on which the agreement changes or the date on which customer receives notice of the change, the basic concept remains the same—the customer becomes "subject to" the new agreement when he or she enters into it by continuing to use TWC's services.  For purposes of calculation, TWC adopted the more consumer friendly application of that concept by using notice as the start date, which moots plaintiff's argument.

resolved in favor of arbitration.  "[W]here the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 485 (6th Cir. 2006).

To be sure, a presumption in favor of arbitrability does not necessarily apply when the parties contest certain matters relating to the validity or enforceability of an arbitration agreement.  *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847 (2010).  In this case, however, the plaintiff does not contest that a valid and enforceable agreement exists between him and TWC.  Instead, the plaintiff asserts that <u>pursuant to that agreement</u>, his opt-out right begins when an irresolvable dispute arises, or when a party seeks to invoke the arbitration clause.  This is a question of interpretation of a valid and enforceable arbitration agreement, and thus the presumption should apply to resolve any remaining doubt.

In *Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006), the First Circuit faced a similar challenge, and found that the "federal policy favoring arbitration trumps the state contract law tenet" of contra proferentem:

> Plaintiffs argue that the arbitration agreements are not enforceable as to their particular antitrust claims because the arbitration agreements do not apply retroactively. Plaintiffs concede that the arbitration agreements are generally valid. Put another way, Plaintiffs argue that their antitrust claims do not fall within the scope of the arbitration agreements as a result of non-retroactivity. Plaintiffs are in fact raising a scope question. . . . Where the federal policy favoring arbitration is in tension with the tenet of contra proferentem for adhesion contracts, and there is a scope question at issue, the federal policy favoring arbitration trumps the state contract law tenet.

*Id*. at 35.  The same reasoning applies here.

The plaintiff's cases do not suggest otherwise.  Indeed, in all but one of the cases that the plaintiff cites to urge construing the Subscription Agreement against the drafter, the court does

not use contra proferentem to find that a dispute was or was not subject to arbitration, which is the only relevant question here.[10]  In *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 25 (1st Cir. 2000), a case that was later clarified by *Kristian*, the court used contra proferentem not to resolve a question of whether a particular dispute was arbitrable, but instead to decide whether a particular party had standing to bring an action to compel arbitration.  In *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63 (1995) the Court used contra proferentem, in concert with the presumption favoring arbitration, to help determine a choice-of-arbitration-law question.  In *Bd. of Trs. Sabis Int'l Sch. v. Montgomery*, 205 F. Supp. 2d 835, 846 (S.D. Ohio 2002), the court used contra proferentem to determine whether the State consented to be sued in federal court when it inserted a binding arbitration clause into a charter school sponsorship contract. And in *Bennett v. Sunnywood Land Dev., Inc.*, 2007-Ohio-2154, ¶ 19, 2007 Ohio App. LEXIS 2031 (Ohio Ct. App. 2007), the court considered only whether an arbitrator acted within his authority under a provision imposing a time limit for arbitrators to act.

Thus, the strong federal policy favoring arbitration likewise favors arbitration here and supports the more straightforward application of the contract that compels arbitration here.

**F.     Even If Adopted, The Plaintiff's Theory Would, At Best, Require Discovery And A Trial On When The Plaintiff Knew Or Should Have Known That He Had A Dispute With TWC.**

Finally, even if the Court adopted some variation of the plaintiff's approach, the plaintiff has far to go before he could ever establish that his opt-out attempts were in fact timely in this instance.  Depending on how the Court were to resolve many of the unanswered questions described above that make plaintiff's interpretation unworkable at the outset, several disputed factual issues would arise requiring discovery and a trial just to determine opt-out timeliness.

---

[10] *Strickler v. First Ohio Banc & Lending, Inc.*, 2009-Ohio-1422, ¶ 13, 2009 Ohio App. LEXIS 1244 (Ohio Ct. App. 2009), is the only case that arguably uses contra proferentem to determine the arbitrability of a dispute and, in that case, the court already had found that the dispute was not subject to arbitration based on the terms of the arbitration provision itself before using contra proferentem to bolster its conclusion.

If timeliness turns on when a dispute begins, factual issues will need to be resolved regarding when the plaintiff first noticed a perceived problem with his price increase, or perhaps more properly, when the plaintiff <u>should have known</u> about the price increase that he asserts gives rise to his claims.  If timeliness turns on when a dispute became irresolvable, factual issues will need to be resolved regarding the parties' communications, when and how the plaintiff analyzed his claims, when and why he concluded that they could not be resolved, whom he consulted regarding this assessment, and, again more properly, what he <u>should have known</u> regarding the dispute.  If timeliness turns on when a party invoked the arbitration provision, still more factual questions will need to be resolved regarding when the plaintiff consulted counsel, when the parties raised the subject of arbitration, when the plaintiff first considered the applicability of the arbitration provision to his claims, and again when the plaintiff <u>should have known</u> that the arbitration provision was in play.

Again, none of these factual issues are relevant under TWC's straightforward interpretation.  But if the plaintiff's interpretation were adopted, and assuming it could be clarified enough to create a workable standard, the work would then need to begin to determine the facts regarding whether the plaintiff's opt-out attempts were timely.  And all of these questions would be for the arbitrator to decide per the parties' agreement.

## III.    <u>CONCLUSION</u>

For the foregoing reasons and those set forth in TWC's Motion, the Court should compel arbitration and, as a result, dismiss the plaintiff's Amended Complaint or, in the alternative, stay this case pending arbitration.[11]

---

[11] For purposes of this reply, TWC assumes certain facts alleged by the plaintiff are true.  Accordingly, nothing in this reply should be construed as an admission of such facts.

Dated: March 1, 2012                    Respectfully submitted,


                                        s/Jeffrey J. Jones
                                        Jeffrey J. Jones (0030059)
                                        jjjones@jonesday.com
                                        Erik J. Clark  (0078732)
                                        ejclark@jonesday.com
                                        JONES DAY
                                        325 John H. McConnell Boulevard, Suite 600
                                        Columbus, OH  43215-2673
                                        Telephone:    +1.614.469.3939
                                        Facsimile:    +1.614.461.4198

                                        *Attorneys for Defendant*
                                        *Time Warner Cable Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2012, a true and correct copy of the foregoing was sent via email and electronically filed with the Clerk of the United States District Court of the Southern District of Ohio, using the CM/ECF system, which will send notification of such filing to counsel of record at the addresses that they have provided to the Court.

Jeffrey S. Goldenberg
Todd B. Naylor
Robert Sherwood
Goldenberg Schneider, LPA
One West Fourth Street, 18th Floor
Cincinnati, Ohio  45202-3604
jgoldenberg@gs-legal.com
tnaylor@gs-legal.com
rsherwood@gs-legal.com

Christian A. Jenkins
Minnillo & Jenkins, Co. L.P.A.
2712 Observatory Avenue
Cincinnati, OH 45202
cjenkins@minnillojenkins.com

*Attorneys for Plaintiff*

s/ Jeffrey J. Jones
One of the Attorneys for Defendant
Time Warner Cable Inc.